MULCAHY *v.* CITY OF AKRON ET AL.

(Decided June 19, 1924.)

*Messrs. Rockwell & Grant* and *Messrs. Commins, Brouse, Englebeck & McDowell,* for plaintiff.

*Mr. H. M. Hagelbarger,* director of law, and *Mr. C. T. Moore,* for defendant City of Akron.

*Messrs. Mather, Nesbitt & Willkie, Messrs. Smoyer, Clinedinst & Smoyer,* and *Messrs. Slabaugh, Young, Seiberling, Huber & Guinther,* for defendant Moran Construction Co.

WASHBURN, J. This is an action, heard in this court on appeal, in which a taxpayer seeks to enjoin the city of Akron from entering into a contract with a certain bidder for the construction of a city hall.

The first question presented for our determination is as to the right of the taxpayer to maintain the suit, his right being challenged on two grounds.

It is first contended that Section 4314, General Code, giving to a taxpayer the right to bring such a suit, has no application in a charter city such as Akron, and that no such right is specifically given by the charter of Akron.

It is provided in the charter that the director of law, in addition to the duties imposed upon him by the charter and ordinances of the city, "shall perform the duties which are imposed upon city solicitors by the general law of the state."

Among the duties of city solicitors referred to are those enumerated in Sections 4311, 4312, and 4313, General Code, which include the bringing of a suit to accomplish what is sought in this suit, and the following section, Section 4314, provides that a taxpayer may bring such a suit if the solicitor, upon written request, fails to bring it. *Ide* v. *State,* 95 Ohio St., 224, 116 N. E., 450.

But, independent of Section 4314, General Code, a taxpayer had a right to bring such a suit in equity, and his right so to do does not depend upon said statute, nor upon the charter, nor the ordinances of the city. Said section was intended to regulate the practice in such cases by requiring the taxpayer, before bringing suit, to request and give the solicitor an opportunity to bring the suit. *Cincinnati Street Ry. Co.* v. *Smith,* 29 Ohio St., 291, at page 303; *Walker* v. *Village of Dillonvale,* 82 Ohio St., 137, 92 N. E., 220, 19 Ann. Cas., 773.

It is next urged that the taxpayer in this case,

being interested in obtaining the contract for a company of which he is president, will be benefited other than as a taxpayer if he is successful in the suit, and for that reason he cannot maintain the suit.

There is no ground, nor any evidence, to support a claim that the taxpayer in this case brought this suit wholly in the interest of persons not parties to the suit, who have agreed that such taxpayer shall not be burdened with the costs or expenses of the suit, including attorney fees. By such means a taxpayer may merely lend his name and status as a taxpayer to further the private ends and ambitions and schemes of others not parties to the suit, and without any risk to him as to such expenses as ordinarily make men hesitate to begin litigation which is of no practical benefit to them. In such a case the question of public policy may be involved, as some of the cases hold; but, where a taxpayer is willing to incur the risk incident to litigation, the mere fact that if he is successful he will be benefited other than as a taxpayer does not establish his bad faith in bringing the suit; he will not be sustained by the courts unless his rights as a taxpayer, and with him the rights of other taxpayers, are injuriously and illegally affected, and, if they are, and he is willing to run the risk of litigation to protect his rights as a taxpayer, his motive in doing so is of no more importance than in other litigation, and it is the general rule that, if a plaintiff shows a good and valid cause of action, his motive in bringing the action is entirely immaterial, and cannot be inquired into. *State, ex rel. Flowers,* v. *Bd. of Education of Columbus,* 35 Ohio St., 368, at page 382;

*Hamilton, G. & C. Traction Co.* v. *Parish,* 67 Ohio St., 181, at page 189, 65 N. E., 1011, 60 L. R. A., 531; *Isom* v. *Low Fare Ry.,* 10 C. C. (N. S.), 89, 19 C. D., 583.

It has been specifically held in other states that the motive of the taxpayer in bringing the suit is immaterial, provided he can show a case of injury to himself as a taxpayer, and that consequently an unsuccessful bidder who is a taxpayer may be, and often is, the plaintiff. 4 Pomeroy's Equity Jurisprudence (4th Ed.), Section 1767.

Our conclusion is that in this case the plaintiff taxpayer has a right to prosecute this action. The principal contention of the taxpayer in this case is that the city of Akron should be enjoined from entering into the proposed contract "on the ground that the scheme adopted by the city for receiving bids and awarding the work is essentially noncompetitive."

Incidentally, it is claimed that certain statutes of the state of Ohio, regulating the making of contracts by municipalities for public work, apply, and that said statutes were not complied with by the officials of the city of Akron.

Without referring specifically to said statutes, we are of the opinion that they have no application to the city of Akron, which is operating under a charter, duly adopted by the people.

The Constitution of Ohio, Section 3, Article XVIII, provides that "municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as

are not in conflict with general laws.'' It is well settled that ''all powers of local self-government'' include powers which involve the exercise of the functions of government as to matters which are local in the sense that they relate to the municipal affairs of a particular municipality, and that the phrase ''as are not in conflict with general laws'' does not limit the municipality in the exercise of its ''powers of local self-government'' as to matters which relate to distinctly local municipal affairs and do not involve the concern of the state at large. *State, ex rel. Lentz,* v. *Edwards,* 90 Ohio St., 305, 107 N. E., 768; *Billings* v. *Cleveland Ry. Co.,* 92 Ohio St., 478, 111 N. E., 155; *Froelich* v. *City of Cleveland,* 99 Ohio St., 376, 124 N. E., 212; *Village of Perrysburg* v. *Ridgway,* 108 Ohio St., 245, 140 N. E., 595. See, also, *State, ex rel. Cist,* v. *City of Cincinnati,* 101 Ohio St., 354, 129 N. E., 595.

The building of a city hall is a matter of local self-government, and the power which the city attempted to exercise in this case is not only given to it by this constitutional provision, but such power is given to it by the charter, wherein it is provided that it ''may create, provide for, construct, regulate and maintain all things of the nature of public works and improvements.'' The charter further provides that the city of Akron shall have all powers granted to municipalities by the Constitution or laws of Ohio, and that such powers, whether express or implied, shall be exercised and enforced in the manner provided by the charter; and, when not prescribed by the charter, then in the manner provided by ordinance or resolution; and, when not prescribed by charter or act of council, ''then said powers shall

be exercised in the manner prescribed by the state law."

As is hereinafter set forth, the charter and ordinances of the city provide how the power to construct a city hall shall be exercised, and those provisions govern rather than "the manner prescribed by state law," and therefore, as has already been stated, the statutes which it is claimed the city did not comply with do not apply, and do not furnish a means by which to test the legality of the action of the city officials.

Under the form of government provided by the charter, as to matters of local self-government, the powers of government, except as limited by the charter, are to be exercised by the council; in other words, the council is the supreme authority, except as that authority is limited by the charter itself or by the Constitutions of the state and nation. Sections 1 and 27, Charter.

The chief administrator, who under the recent amendment of the charter is now the mayor, through his control and supervision of the director of public service, has charge of the making and preservation of maps, plans, drawings, and estimates for, and of the construction of, all public buildings (Section 65, Charter), but, so far as such public improvement is concerned, he is an executive officer, charged with the duty of executing the ordinances passed by the council in reference thereto (Section 57, Charter).

As we construe these provisions, the charter does not vest in the chief administrator the power to finally adopt for the city the plans and specifications for a city hall, but such power rests in the

council, and there is no claim in this case that the council by ordinance or resolution delegated such authority to any board or officer; hence the plans and specifications for this city hall were adopted and promulgated by the body which is vested with the exercise of all powers of local self-government, and all the provisions of said plans and specifications which are not in conflict with the charter or the state and national Constitutions are valid, because they are within the power of the council to adopt.

The charter of the city of Akron provides that "public improvements of all kinds may be made by the appropriate departments, either by direct employment of the necessary labor and the purchase of the necessary supplies and materials, with separate accounting as to each improvement so made, *or by contract duly let after competitive bidding,* as the council may determine."

The council in this case, after specifically approving the plans and specifications for the city hall, authorized and directed the director of public service to enter into a contract for the construction of such hall "with the lowest and best bidder after advertisement according to law." The council therefore determined that such contract should be "duly let after competitive bidding," and the troublesome and important question in the case is whether the plans and specifications adopted by council, and the acts of the city officials in reference thereto, violated the provisions of the charter which required the contract to be let upon "competitive bidding."

While it is true that the plans and specifications were specifically adopted and approved by the council, the council is controlled by the charter, and, having determined that the contract should be let after competitive bidding, the council was without power to nullify that determination by the adoption of plans and specifications which did not provide for competitive bidding.

This action is not brought by or on behalf of a competitive bidder, and no fraud or collusion or bad faith is charged, and we are not concerned with, and are not asked to consider, the rights or supposed rights of bidders. We are concerned only with the rights of a taxpayer.

Under the facts in this case and the law applicable thereto, a taxpayer has the right to complain and to prevent the execution of the proposed contract for this improvement if the contract was not "duly let after *competitive bidding.*"

It is claimed by the taxpayer in this case that there was no competitive bidding because in some instances and as to some articles or products the specifications, for the purpose of establishing a standard of materials or workmanship by which all bidders should know the quality required, named the manufacturer or producer of the article specified, and required the bidder to bid upon such specified articles, naming the price therefor, and then invited the bidder to bid upon alternates for such articles, not mentioned in the specifications, but suggested by the bidder as a substitute for the article specified, and requiring the bidder to give full information in reference to such proposed substitute and the reasons therefor and advantages

to be derived therefrom and the effect on the contract price, and, if requested by the architect after submission of bids, to furnish detailed specifications and complete information of such proposed substitute.

In some instances, more than one special make or brand or kind or rating of an article was specified, and it was provided that the base bid should be understood to include the furnishing of any one from the groups of makes, brands, kinds, or ratings set up as standard, and then the specifications provided that ''substitutes for all specified items will be considered,'' and the specifications also provided that, when ''substitutions for constructions or articles specified for in the base bid are offered, the bidder shall state the effect on the amount of the base bid which would result by adopting such alternate or substituted construction or articles in place of the kind shown and specified.''

It is claimed that it is therefore evident that the object of inviting bidders to propose and name a price for substitutes was to permit the city to adopt such proposed substitute in the place of the specified article, if the price and advantages of such substitute made such action advisable, and that this plan afforded no means of competition among bidders, as the various bidders did not bid upon the same substitutes, and that there could be no such competition as is required by the charter, unless the city specified its requirements, and required all bidders to bid upon the *same* requirements.

While the specifications may be construed as indicated in the claims set forth above, and while under such specifications there may be substitutes

proposed by the bidders as to which there may not be competition, and while, if such substitutes were adopted and were of sufficient number and importance to warrant the conclusion that the plans and specifications upon which the contract was awarded were not substantially the same as the plans and specifications upon which bidders were asked to bid, then, because of a lack of competitive bidding as to a material part of the proposed improvement, no valid contract could be entered into.

But the facts as shown by the evidence in this case do not show a situation such as has been indicated. This contract was for an improvement costing nearly $700,000, and in the specifications there were provided and set forth thirty alternates upon which all of the bidders were asked to bid, and upon which most of the bidders did bid, and, while the specifications in a few instances invited bidders to suggest substitutions, the contract as awarded was not based upon, and did not include, any substitutes so suggested. The city did adopt a few of its own alternates, and as to all of them there was competition—many of the bidders having bid upon them; and it is not claimed that the city did not have authority to invite alternate bids, provided such alternates were properly described and set forth in the specifications, and such invitation was extended to all bidders alike.

"Plans and specifications which provide in the alternative for different materials and methods of construction, and are full, accurate and complete as to each alternative * * * and afford the opportunity for full competition as to each alternative, are valid; and an award to the lowest bidder on such

alternatives as may be finally adopted, after the bids have been opened and considered, will be sustained." *State, ex rel. Waltz,* v. *Green,* 22 C. C. (N. S.), 1, 29 C. D., 636.

As all of the alternates that were adopted by the city were included in the bids of the various contractors, and as no substitution proposed by a bidder was adopted by the city, we are clearly of the opinion that the provisions in the plans and specifications as to substituted bids did not render the letting of the contract in this case illegal because of lack of competitive bidding.

The record discloses that, as to the ornamental ironwork for the building, the specifications—after describing the scope of the work, and detailing how it should be performed and the materials to be used, and providing that the work should be done by mechanics highly skilled in their respective trades in order to produce first-class construction and installation of the work, and that all materials should be the best of their respective kinds obtainable in the market for use in strictly first-class work—provided that "this work shall be of the *standard* of the Flour City Ornamental Iron Company of Minneapolis, or of the W. S. Tyler Company of Cleveland," and, while the specifications also invite substitute bids in reference thereto, to be suggested by the bidders, the successful bidder did not suggest any substitute, and the city did not adopt any substitute, and the contract awarded was not based upon any substitute.

But it is claimed by the taxpayer in this case that, while the successful bidder based its bid upon plans and specifications as to this item, the city has, in

effect, agreed that the ornamental ironwork may be done, not by the Flour City Ornamental Iron Company or by the W. S. Tyler Company, but by the Ornamental Iron Works Company of Akron, Ohio, and has thus agreed to accept work and materials not of the quality specified.

This claim is made because of another provision of the specifications by which the bidders were asked to name the subcontractors proposed for the principal parts of the work, and the successful bidder named the Ornamental Iron Works Company of Akron, and the city did not object to such subcontractor, as it might have done under the plans and specifications, but declared that such subcontractor was satisfactory to the city.

In view of the provisions of the plans and specifications which provide that the naming of the Flour City Ornamental Iron Company and of the W. S. Tyler Company should be understood as establishing a *standard* of materials and workmanship, and, in view of the fact that the successful bidder by his bid offered to do ornamental ironwork of that standard, we are of the opinion that the bidder is required to conform to such standard, and the mere fact that the city does not object to having work done of that standard by the Ornamental Iron Works Company of Akron in no way binds the city to accept ironwork inferior to the standard specified and bid upon.

What has been said as to the ornamental ironwork applies to the items of granite, vault doors, and some other matters about which complaint is made.

As to granite, the specifications are very full and complete, providing that, after the award of the contract, samples showing quality, color, and texture should be submitted to and approved by the architect, and providing that ''all granite shall be selected to meet the requirements of these specifications and shall be absolutely sound and free from seams or other defects which would impair its strength,'' and ''must be obtained from approved, well-known quarries, having capacity and facilities for furnishing the quantity, sizes and quality of granite required,'' and that ''all granite shall be of compact structure, hard and practically nonabsorbent, and equal in durability and strength to the best commercial grade of kind required,'' and ''shall be light gray, medium grain of the kind designated as 'Concord granite,' quarried at Concord, N. H.; 'Chelmsford gray,' at West Chelmsford, Mass.; 'Milford,' at Milford, N. H.; 'Woodbury gray,' at Woodbury, Vt.; or 'Rockport gray,' at Rockport, Mass. In submitting estimate, the contractor shall state the name of the granite, and the quarry upon which his bid is based.''

In the form of bid there was no space left in which the bidder was to name the granite and quarry upon which the bid was based, and the successful bidder did not in its bid state the name of the granite and quarry upon which its bid was based; but that we regard as a minor, rather than a vital and essential, matter. In view of the general provision that, when any special makes, brands, kinds, or ratings of materials are specified, ''it shall be understood as establishing a *standard* of materials'' by which all bidders should know the quality required, and that

the "bid will be understood to include the furnishing of any one from the groups of makes, brands, kinds or ratings set up as standards," we think the bidder who did not name the granite and quarry upon which its bid was based is required to furnish granite from any of the named quarries that the city selects, or that such bidder may be permitted to furnish from any well-known quarry granite which is of the high grade described in the specifications, but that the city is not bound to accept any granite that does not comply with the specifications.

The mere fact that the successful bidder failed to name the granite and quarry upon which its bid was based, but did bid to furnish granite of the quality of the standard specified, to be selected by the city, did not render the bid noncompetitive. The competition was on the price of the quality specified, and not as to the source from which the granite should come.

The city not having bound itself to accept work inferior to that specified, we are not at liberty to assume that the city will do so, and, if it does not, a taxpayer cannot complain.

There is a further complaint made, and that is as to the provision in the specifications relative to the contractors submitting the names of subcontractors proposed for the principal parts of the work. The specifications provided that:

"The contractor shall, as soon as practicable, after the signature of the contract, notify the architect in writing of the names of subcontractors proposed for the principal parts of the work and for such others as the architect may direct and shall not

employ any that the architect may, within a reasonable time, object to as incompetent or as unfit.

"If the contractor has submitted, before signing the contract, a list of subcontractors and the change of any name on any list is required or permitted after signature or agreement, the contract price shall be increased or diminished by the difference between the two bids."

The specifications also provided that:

"The competency and responsibility of the bidders and their proposed subcontractors, and the date of completion set up by the bidder in the proposal form, will be considered in making the award."

And it is also provided in the specifications that "nothing contained in the contract documents (which included the plans and specifications) shall create any contractual relation between any subcontractor and the owner."

These provisions construed together *require* the bidder to submit the names of his proposed subcontractors as soon as practicable after the contract is signed, but give to the bidder the *option* of submitting the names of his proposed subcontractors with his bid or at any time before the contract is signed, and do not require him to submit such list with his bid.

These specifications were adopted by the council, and the officers of the city who are charged with the duty of executing the orders of the council in reference to this matter were bound thereby. The specifications did not contain a form of bid, and hence nothing could be *required* in the form of bid that was not provided for in the specifications.

The officers of the city, however, left a blank in the form of bid for the insertion of the names of proposed subcontractors, and in a parenthesis provided that "one or more names must be inserted for each and every trade making up the entire work." The successful bidder stated in the bid that such list would be submitted before the contract was signed; thereby indicating the bidder's intention to avail itself of the option given to it by said specifications.

As the specifications did not require such list to be submitted with the bids, the provision in the proposal for such submission was the act of the officers of the city, and not the act of the council, and a strict compliance with such provision could therefore be waived by the city officials, the rights of the public not being prejudiced thereby. *State, ex rel. Ross,* v. *Bd. of Ed.,* 42 Ohio St., 374. The officers of the city in this case did not reject the bid of the successful bidder, but waived said provision only so far as to permit such list to be furnished and considered after the bids were opened.

The provision referred to in the proposal not being required by the specifications, and there being no fraud or collusion claimed, we think such provision could be waived, as was done in this case— at least to the extent of requiring the list to be furnished after the bids were opened, together with proof to the full satisfaction of the city officials that such subcontractors were at the time the bids were made the bidder's bona fide proposed subcontractors.

As has been indicated, the evidence in this case discloses that with its bid the successful bidder did

not furnish the names of its proposed subcontractors, but that, before the alternates were adopted, and the contract was awarded, the city required the successful bidder to furnish the names of its proposed subcontractors, and to produce evidence that they were its bona fide proposed subcontractors at the time its bid was filed, and the city, after considering said proposed subcontractors, and before the contract was awarded, formally declared that said subcontractors were satisfactory.

As we have said, that does not bind the city to accept the work of such subcontractors if their work does not conform to, and comply with, the specifications, and moreover, the city can make certain of that by placing a specific provision to that effect in the contract with the successful bidder, which is yet to be executed, and we have no doubt that that will be done, in view of the fact that the evidence in this case discloses that both the successful bidder and the city officials fully understand that the successful bidder is to comply with the specifications, regardless of who the subcontractors are.

What has been said as to the power of the city disposes of the objections made to the provisions of the specifications as to arbitration. In the absence of a charter prohibition, the council has authority to provide as it did.

As we have seen, the city council having adopted and promulgated the specifications, and having full and complete power in reference to the making of this improvement, limited only by the requirement of the charter that the contract should be ''duly let after competitive bidding,'' and having found that

the proceedings of the council and the officers of the city are not in conflict with said charter limitation, we are of the opinion that this court is without authority to interfere with, or control, the acts of the city officials.

We are not called upon to pass upon the question of the wisdom of accepting or rejecting any of these bids. That matter is confided to officers who are responsible to the people for their action.

*The petition of plaintiff is dismissed at his costs.*

FUNK, P. J., and PARDEE, J., concur.