**Earl Eugene BOX**

v.

**George PETSOCK (Warden), Richard A. Lewis (Dauphin County D.A.), Leroy Zimmerman, (Atty. Gen.).**

**Civ. No. 86–1704.**

United States District Court, M.D. Pennsylvania.

Nov. 16, 1987.

Earl Eugene Box, Pittsburgh, Pa., Melinda Ghilardi, Asst. Federal Public Defender, Scranton, Pa. (court-appointed), for petitioner.

Todd B. Narvol, Deputy Dist. Atty., Harrisburg, Pa., for respondents.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

The instant Petition for Writ of Habeas Corpus was submitted pursuant to 28 U.S.C. § 2254 on December 2, 1986. Petitioner, an inmate at S.C.I.–Pittsburgh, PA presented fifteen separate claims, alleging error by the trial court and ineffective assistance of counsel. *See* document 1 of the record. Respondents filed a Second Answer to the habeas corpus petition on July 8, 1987. *See* document 22 of the record.[1] Petitioner submitted a Counter Answer on August 3, 1987 and Amendments to the Counter Answer on August 6, 1987 and August 17, 1987. *See* documents 33, 34, and 35 of the record.

This matter is now ripe for disposition. In accordance with the reasoning set forth below, the court will dismiss the instant Petition for Writ of Habeas Corpus.

## FACTUAL BACKGROUND

On September 14, 1974, shortly after midnight, Steelton police received a call to investigate a shooting at Mueller's Tavern, a family-owned bar/restaurant located in the borough.[2] The bar had been the target of a robbery. Three armed men had entered the establishment and ordered everyone to lie on the floor. One patron ran into the tavern's kitchen and began to run up the stairs that connected the first floor tavern to the upstairs family living quarters. She fainted on the steps after seeing that one of the gunmen had followed her.

Twenty-year-old John B. Mueller III was upstairs and apparently heard the commotion; he came to the top of the stairs. The gunman fired a single .32 caliber bullet which pierced Mueller's heart. He died a short time later.

The gunmen fled with money taken from cash registers and patrons. They entered a waiting car and sped off.

This incident was one in a series of similar robberies that occurred in the Harrisburg area. A subsequent robbery took place at the Fireside Bar in Carlisle. It resulted in the shooting death of a patron named Paul Liebold. Two days later one of the defendant's companions, Frank Martin, attempted to cash one of Liebold's checks. A suspicious teller kept the check and got the license number of the vehicle in which Martin was riding. He was subse-

---

1. For the complete procedural history of this case, see the Orders of this court dated April 2, 1987, June 18, 1987, and July 17, 1987. *See* documents 13, 21, and 30 of the record.

2. These facts are taken from the decision of the Dauphin County Court of Common Pleas denying petitioner's request for relief under the Post Conviction Hearing Act, 42 Pa.C.S.A. § 9541 *et seq*. *See Commonwealth v. Box*, Nos. 965, 968 C.D. 1975 (April 4, 1983).

quently arrested and identified in a lineup. Based on information received from Martin, police learned of the defendant and issued a warrant for his arrest. A search of an abandoned apartment which had been rented by a woman named Nellie Dixon, and which was said to be the defendant's residence, revealed two guns, at least one of which was used by the gunmen. The defendant was later arrested in Boston, Massachusetts.

During the trial the defendant's companions identified him as the person who shot and killed John Mueller III. The Commonwealth also introduced evidence of the other robberies committed by the gang as well as one of the guns found in the Dixon apartment. The court instructed the jury on the elements of first, second and third degree murder and on those of robbery. After several hours of deliberation they found the defendant guilty of both murder in the second degree and robbery. Defendant was sentenced to a term of life and two consecutive terms of ten (10) to twenty (20) years.

## DISCUSSION

This court's latitude in reviewing the state court proceedings is limited. 28 U.S. C. § 2254(d) directs that the factual findings of both the trial court and the Pennsylvania Supreme Court "shall be presumed to be correct." *See Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). *Sumner* holds that a habeas corpus petitioner, in order to overcome state court factual determinations, must demonstrate "by convincing evidence" that the state proceeding was inadequate or the determinations clearly erroneous. *See Hubbard v. Jeffes*, 653 F.2d 99, 102 (3d Cir.1981).

Petitioner's main contention is that he was denied effective assistance of counsel. The test for ineffective assistance of counsel contains two hurdles: (1) the convicted defendant must show that his counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) the convicted

defendant must establish that the deficient performance prejudiced his defense to the extent that it deprived him of a fair judicial proceeding whose result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

The court in *Strickland* elaborated upon the first prong in the test, stating as follows: "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d 674. The court also noted that counsel is presumed to have rendered adequate assistance, that counsel has a duty to make reasonable investigations, and that the question of counsel's ineffectiveness is a mixed question of law and fact. *Id.* at 690–691, 698, 104 S.Ct. at 2066, 2070, 80 L.Ed.2d 674.

The court in *Strickland* explained the second prong in the test in the following manner: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d 674; *see also Hubbard v. Jeffes*, 653 F.2d 99, 104 (3d Cir.1981); *Williams v. Zimmerman*, No. 86–5731 (E.D.Pa. June 18, 1987) [available on WESTLAW, 1987 WL 12754]; *Commonwealth v. Hubbard*, 472 Pa. 259, 278, 372 A.2d 687, 696 (1977) (counsel is not ineffective for failing to raise a baseless claim).

█ This court is convinced that under the above standards, petitioner received effective assistance from counsel and that petitioner's claims are without merit. Those claims will now be reviewed *in seriatim*. Petitioner first claims generally

that he was denied effective assistance of trial counsel, appellate counsel, and post-conviction counsel. *See* document 1 of the record, at ¶ 12(A). Petitioner claims that counsel was ineffective for causing petitioner to lose his appeal rights and in connection with the fourteen specific issues discussed *infra*. Since petitioner concedes in the petition that his appeal rights were reinstated, he can show no prejudice, and so his contention is meritless. Petitioner's claim that counsel was ineffective based on the other issues presented in the petition will be discussed *infra* in connection with those other issues.

■ Petitioner next asserts that he was denied effective assistance of counsel in that trial counsel was unprepared for trial, had only one interview with petitioner, failed to call witnesses to the alleged illegal search and seizure, failed to thoroughly cross examine witnesses, mainly detective Macon, and failed to object on petitioner's behalf. Petitioner concludes that his trial proceedings were thus "a farce and a mockery of justice". Petitioner's contentions are clearly without merit.

In *Smith v. United States*, 644 F.Supp. 303, 308 (D.Md.1986), *aff'd*, 815 F.2d 74 (4th Cir.1987), the court stated as follows:

Implicit in the right to effective assistance of counsel is that an accused and his attorney shall have a reasonable time to investigate, prepare and present a defense. No set length of time is guaranteed, and whether defendant is denied his right must be determined under the circumstances of each case. *Chambers v. Maroney*, 399 U.S. 42, 54, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970).... Counsel should confer with his client to advise him of his rights and to elicit matters of defense or to ascertain that potential defenses are unavailable. Counsel must conduct appropriate investigations to determine if a defense can be developed, and allow enough time for reflection and preparation for trial. *Coles v. Peyton*, 389 F.2d 224, 226 (4th Cir.1968), *cert. denied*, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968). *See also United*

*States v. DeCoster*, 487 F.2d 1197, 1203–04 (D.C.Cir.1973).

■ The record in this case does not support petitioner's contention that trial counsel was unprepared. While petitioner claims that his attorney met with him only once, his attorney testified that he met with petitioner at least five times. *See* document 26 of the record, at p. 6. To the extent that petitioner bases this claim on counsel's failure to interview witnesses to the allegedly illegal search and seizure or to support his objection to the "common scheme" evidence with a memorandum of law, it is likewise without merit inasmuch as the court concludes *infra* that the common scheme evidence was properly admitted and that petitioner had no standing to object to the contested search and seizure at Nellie Dixon's apartment. *See infra* at pp. 827–829, 833–834. The record also establishes that trial counsel objected at various points on petitioner's behalf, especially in regard to the "common scheme" evidence, and that counsel cross-examined Detective Macon on the only point possible, *i.e.*, the possibility of someone having planted the evidence in Nellie Dixon's apartment.

Trial counsel was appointed over sixty days before the trial. *See* document 1 of the record, at p. 5, ¶ 12(B). He conducted pretrial discovery and filed various pretrial motions on behalf of petitioner and followed the trial proceedings of petitioner's co-defendants. *See* document 26 of the record, at pp. 4–6, 15–16. Counsel consistently pursued the theory that the petitioner had not been involved in the incident at Mueller's Tavern and that he was being made the scapegoat by the other defendants. *See id.* at pp. 9–10; *see generally id.* at pp. 3–27. Counsel presented an opening argument, cross-examined prosecution witnesses, made timely objections to questions and the admission of evidence, helped petitioner present his own testimony, and made a closing argument to the jury. *See generally* documents 23 and 24 of the record (trial transcript).

It is obvious that petitioner is dissatisfied with trial counsel's representation. The

test, however, is whether trial counsel's representation satisfied professional standards. Based on the totality of circumstances in this case, the court concludes that counsel's representation more than met those standards. In addition, petitioner has not established that counsel's alleged unpreparedness or deficiencies prejudiced the outcome of the trial.

Petitioner next contends that trial counsel was ineffective for failing to file a pretrial suppression motion. Petitioner claims that there was no probable cause supporting petitioner's arrest or the search of his dwelling. This court concludes, based on petitioner's testimony at trial, that he lacked standing to object to the search of Nellie Dixon's apartment. As the court also concludes that probable cause existed to support petitioner's arrest, this claim will also be dismissed.

▮ At trial, petitioner was asked several times if he lived in Nellie Dixon's apartment over the Penn Photo store on Third Street in Harrisburg. As the following excerpts from the transcript illustrate, petitioner consistently answered in the negative:

Q. Did you have an apartment here in Harrisburg?

A. No, sir, I never had an apartment here in this city, no, sir.

\* \* \* \* \* \*

Q. Did you live in the apartment over Penn Photo on Third Street?

A. Let me explain this to you. The young lady that was living there by the name of Nellie, I can't really pronounce the name. She was living there, right. I knew the young lady. I used to go there, in and out, you know, but I never lived there.

\* \* \* \* \* \*

Q. Did you ever stay with her in [the apartment above the Penn Photo store]?

A. I have been there a couple of times, yes, sir.

Q. Did you ever spend the night?

A. Yes, sir.

Q. Did you ever have any clothes that you kept up there?

A. Did I ever have any clothes? Maybe I had a couple pieces of clothes, yes.... Maybe, I don't remember, sir.

Q. While you were in this Harrisburg area, what did you do with your personal belongings, your clothes?

A. I told you this was never my permanent address. I told you that I was to and fro.

\* \* \* \* \* \*

Q. You said on your direct testimony one of the ways you were getting money to live was off of DPA. Were you getting assistance in Harrisburg?

A. Yes, I were. I said that was one of the ways—I didn't say that was the only way.

Q. To get assistance you have to have an address. What address did you give them as your address in Harrisburg?

A. I gave them an address on Third Street at the youth place, that is what I am trying to bring out.

Q. The youth center?

A. I don't know the name of it.

*See* document 24 of the record, at pp. 488, 499–500, 501–502. Consistent with this testimony, at the PCHA hearing, petitioner's trial counsel testified that petitioner had advised him that he had no residence in Harrisburg. *See* document 26 of the record, at pp. 6, 7, 8, 9, 12–13, 14–15, 24–25.

The Court of Appeals for the Third Circuit has set out the following standard for a claim based on the Fourth Amendment:

An essential element to a successful challenge of a search and seizure ... on Fourth Amendment grounds is the existence of a legitimate expectation of privacy.... There is, however, no recognition of the legitimacy of a defendant's expectations of privacy where the area searched is in the control of a third party.... "Fourth Amendment rights are personal rights, which, like some other

constitutional rights, may not be vicariously asserted...." "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."

*Government of Virgin Islands v. Williams*, 739 F.2d 936, 938 (3d Cir.1984) (citing *United States v. Salvucci*, 448 U.S. 83, 93, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 132–34, 140–150, 99 S.Ct. 421, 424–425, 428–434, 58 L.Ed.2d 387 (1978), *reh'g denied*, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979)).

Petitioner established by his own testimony that he did not have a legitimate expectation of privacy in Nellie Dixon's apartment. Petitioner never lived at that apartment. He had only been there "a couple of times." He could not say for certain whether he ever kept any clothes there. Petitioner does not claim that he was present when the search took place. He does not claim that he had a key to the apartment or that he had the ability to exclude others from the apartment. Since he testified he did not live there, he apparently had no subjective expectation that any material he might leave there would remain private. At best, petitioner can claim to be an occasional guest at the apartment. Based on all the circumstances, especially petitioner's own testimony, this court concludes that petitioner did not have a reasonable expectation of privacy in Nellie Dixon's apartment. *See, e.g., United States v. Rackley*, 742 F.2d 1266, 1270 (11th Cir.1984); *United States v. Nabors*, 761 F.2d 465, 468–470 (8th Cir.1985), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985), *reh'g denied*, 474 U.S. 1077, 106 S.Ct. 840, 88 L.Ed.2d 810 (1986) and cases cited therein.

As stated previously, an attorney will not be held ineffective for failing to pursue a meritless claim. *Hubbard, supra; see also Strickland, supra*, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d 674 ("when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable"). Since petitioner had no legitimate expectation of privacy in the Dixon apartment, he has no standing to object to the search and seizure. The suppression motion would therefore have been meritless, and so counsel cannot be said to be ineffective for not filing it. *Hubbard, supra*.

■ The same holds true for the arrest warrant. "Probable cause exists if the arresting officer is possessed of facts and circumstances that would warrant a man of reasonable caution to believe the arrested person had committed a crime." *Commonwealth v. Allen*, 239 Pa.Super. 83, 90, 361 A.2d 393, 396 (1976) (citing *Commonwealth v. Sharpe*, 449 Pa. 35, 296 A.2d 519 (1972)). The fourth amendment mandates that the issued warrant "particularly describ[e] ... the persons or things to be seized"; Fed.R.Crim.P. 4(c)(1) provides that a warrant "shall contain the name of the defendant or, if his name is unknown, any name or description by which he can be described with reasonable certainty," and this Rule has been read as a gloss on the fourth amendment. *United States v. Doe*, 703 F.2d 745, 747 (3d Cir.1983) (citing *Wong Sun v. United States*, 371 U.S. 471, 481 n. 9, 83 S.Ct. 407, 414 n. 9, 9 L.Ed.2d 441 (1963)).

Here, petitioner has not provided this court with a copy of the arrest warrant at issue. Adding to the difficulty is that respondents have not specifically addressed this issue in their Second Answer. Nevertheless, by reviewing the testimony of Detective Macon, *see* document 24 of the record, at pp. 445–447, this court concludes that the arrest warrant satisfied the requirements of the fourth amendment.

■ The arrest warrant was based on information provided by Frank Martin, a co-defendant in the string of robberies. The warrant named a man by the name of Earl, last name unknown, contained a description of the individual sought, and listed an address at which the individual was thought to be staying. *See id.* at p. 446.

Although the description is not given in the transcript, it was obviously sufficient to permit the apartment manager to identify the petitioner as the man for whom the detectives were looking. *Id.* Thus, this court concludes that the warrant satisfied the "reasonable certainty" requirement of the fourth amendment. *See Doe, supra,* at 747 n. 4 and authorities cited therein.[3]

■ Petitioner's fourth claim is that trial counsel was ineffective for failing to object to or request a mistrial after testimony by Commonwealth witness Frank Martin regarding petitioner's characterization of the murder victim as a "devil." The relevant testimony is as follows:

Q. When you got back there did you go in?

A. Yes. We went inside Earl's apartment, myself and Mary Giles and me and Earl started talking. He was telling me about he shot the man inside of the bar and he asked me did I want to move in with him and I said no and after that he told me, he said that ain't nothing but.

Q. He told you what?

A. That that was just one last devil that they have to deal with, that he had to deal with.

Q. Who was he talking about when he said that?

A. When a Muslim says a devil he means a white person.

Q. Who was he talking about that night?

A. The man that he had killed down to the bar.

Document 24 of the record, at p. 403. Petitioner claims that the prosecution "knowingly and deliberately elicited the above prejudicial testimony from its witness in order to impeach petitioner's credibility by appealing to the racial and religious prejudice of the all white jury, (the deceased being white) and inflame the passions of the jury...." *See* document 1 of the record, ¶ 12(D). Petitioner claims that the testimony was irrelevant and had no purpose other than to prejudice petitioner in the eyes of the jury. *Id.*

Petitioner's claim that the testimony was irrelevant is clearly without merit. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401; *see also Martin v. Soblotney,* 502 Pa. 418, 422, 466 A.2d 1022, 1024 (1983) (evidence is relevant if it tends to make a fact at issue more or less probable). Clearly, a defendant's statement to another party, even a codefendant, that he shot and killed another person, along with his reasons for doing so, are facts of consequence and make a finding of guilt more probable than it would be without that evidence. Here, the prosecution's witness testified that petitioner stated that he shot a man in a bar. That shooting could have been accidental or unintended, and so the prosecutor continued his line of questioning. The witness then relayed petitioner's statement about the victim being one less devil he had to deal with. This statement went to several facts at issue, for example, that petitioner intended to kill and that petitioner acted with malice, and so it was clearly relevant. *See, e.g., Commonwealth v. Tomoney,* 488 Pa. 324, 329, 412 A.2d 531, 533 (1980) (specific intent to kill may be inferred from assailant's words or conduct or from attendant circumstances); *Commonwealth v. Kersten,* 333 Pa.Super. 343, 352, 482 A.2d 600, 604 (1984) (malice, which may be inferred from attending circumstances in a homicide prosecution, consists either of an express intent to kill or inflict great bodily harm, or of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, indicating unjustified

---

**3.** Moreover, even if there were no probable cause to support the arrest warrant, petitioner has failed to claim, and this court is unable to find, any prejudice resulting from the arrest itself. For example, petitioner does not claim that a confession or some other incriminating evidence was obtained while he was under arrest. Thus, petitioner's third claim is also without merit.

disregard for probability of death or great bodily harm).

If evidence has probative value, it is ordinarily admissible regardless of an imagined reaction of a jury. *Travis v. United States*, 269 F.2d 928, 939 (10th Cir. 1959), *rev'd on other grounds*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961). "Probative evidence will frequently be prejudicial to a party, but that does not mean that it will cause the factfinder to ground a decision on an emotional basis." *Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 863¢ (5th Cir.1983). Thus, it is only when the probative value of evidence is substantially outweighed by the danger of unfair prejudice that it should be excluded. *See* Fed.R.Evid. 403; *cf. Commonwealth v. Travaglia*, 502 Pa. 474, 492, 467 A.2d 288, 297 (1983) and cases cited therein; *Commonwealth v. Dear*, 342 Pa.Super. 191, 201 n. 1, 492 A.2d 714, 719 n. 1 (1985) and cases cited therein ("evidence of other offenses is subject, as is all relevant evidence, to exclusion if its probative value is outweighed by the 'danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy.' ").

This court is unable to conclude that the high probative value of petitioner's admission was outweighed by the danger of unfair or undue prejudice to the petitioner. The mere fact that petitioner was a member of a "religious minority" does not give rise to a presumption that jurors of different religious affiliations would treat the petitioner differently than they would treat any other defendant. *See United States v. Hoffman*, 806 F.2d 703, 710 (7th Cir.1986), *cert. denied*, 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987), *reh'g denied*, —— U.S. ——, 107 S.Ct. 2205, 95 L.Ed.2d 859 (1987). In addition, although the entire transcription of the voir dire is not before the court, it is clear that the court took steps to insure that the panel of jurors did not harbor any feelings based on religious affiliation of the petitioner that would preclude it from deciding the case on a fair evaluation of the evidence presented. *See* document 23 of the record, at pp. 3–4; *see also Hoffman, supra*, 806 F.2d at 710–711. Since it is presumed that a jury is impartial and that it faithfully performed its duties, *see, e.g., United States v. Winkle*, 587 F.2d 705, 714 (5th Cir.1979), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); *United States v. Eldred*, 588 F.2d 746, 752 (9th Cir.1978), and since petitioner has presented no specific evidence to rebut the presumption, the court concludes that, even if an objection would have been made, the admission would properly have been received into evidence. Thus, counsel cannot be found ineffective for failing to make a meritless objection. *Hubbard, supra.*[4]

The fifth claim of petitioner is that he was denied effective assistance of counsel in that his trial counsel elicited testimony from petitioner regarding petitioner's religious beliefs and affiliations. *See* document 1 of the record, ¶ 12(E). Petitioner makes specific reference to pages 479 and 480 of the trial transcript, *see* document 24 of the record, at pp. 479–480, and argues that this testimony was admitted in violation of 42 Pa.C.S.A. § 5902(b).[5] Petitioner claims that the testimony was irrelevant and that it was prejudicial in that it associated petitioner with a "minority religion" and with a group "dedicated to the overthrow of America by force and violence." *See* document 1 of the record, ¶ 12(E).

Addressing first petitioner's reliance on 42 Pa.C.S.A. § 5902(b), such reliance is misplaced. The Pennsylvania Supreme Court has rejected a *per se* rule of reversible error in any case in which a reference to religious belief occurs; instead, "[w]hether evidence, admitted in violation of a statute,

---

4. Again, assuming *arguendo* that an objection would have been sustained had one been made, the court is unable to conclude that the error is "sufficient to undermine confidence in the outcome" of petitioner's trial. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d 674. Thus, petitioner's fourth contention fails to satisfy either prong of the *Strickland* test.

5. "No witness shall be questioned, in any judicial proceeding, concerning his religious beliefs; nor shall any evidence be heard upon the subject, for the purpose of affecting either his competency or credibility." 42 Pa.C.S.A. § 5902(b).

actually deprives a defendant of his rights to a fair trial must be viewed in light of the attendant circumstances." *Commonwealth v. Mimms*, 477 Pa. 553, 559 n. 8, 385 A.2d 334, 336 n. 8 (1978); *see also Commonwealth v. Rainey*, 271 Pa.Super. 240, 246, 412 A.2d 1106, 1108–1109 (1979). The main purpose of the rule is to prohibit inflammatory questions that could "form in the minds of the jury bias and hostility toward [the defendant] and thus prevent an objective verdict." *Commonwealth v. Hoskins*, 485 Pa. 542, 556, 403 A.2d 521, 528 (1979); *see also Commonwealth v. Brown*, 247 Pa.Super. 401, 372 A.2d 887 (1977).

That purpose was not implicated by the testimony to which petitioner objects. During the Commonwealth's case in chief, several witnesses made reference to petitioner's affiliation with the religion of Islam. *See, e.g.,* document 23 of the record, at pp. 178–179; document 24 of the record, at pp. 372–373, 403, 413–414. As petitioner himself testified, a small minority of the adherents to that religion, the "five percenters of Islam," subscribe to a violent philosophy. *See* document 24 of the record, at pp. 479–480. The line of questioning started by trial counsel and the testimony that petitioner himself volunteered was clearly meant to disassociate petitioner from that small violent minority. Far from prejudicing petitioner in the eyes of the jury, the testimony was elicited to eliminate any possible prejudice the jury might attach to the references by the Commonwealth's witnesses.

For these same reasons, counsel cannot be found to be ineffective for eliciting the testimony. It should be noted that the specific testimony to which petitioner refers was not drawn out by counsel but was volunteered by the petitioner. *See id.* In any event, it was certainly reasonable for counsel to attempt to divorce petitioner from any negative connotations associated with the term Muslim. Thus, it cannot be said that counsel was ineffective for initiating this line of questioning.[6]

Petitioner's sixth, seventh, and eighth claims will be taken together. Petitioner's sixth claim is that he was denied effective assistance of counsel in that "trial counsel failed to challenge the admission of illegally obtained evidence." *See* document 1 of the record, at ¶ 12(F). Petitioner's seventh claim is that trial counsel was ineffective in failing to call witnesses to testify regarding the legality of the search and seizure at the Dixon apartment. *See id.,* ¶ 12(G). Petitioner's eighth claim is that trial counsel was ineffective for failing to object "to the introduction and admission of highly prejudicial evidence having no relevancy to the instant case." *See id.,* ¶ 12(H).[7]

The court has previously held that petitioner does not have standing to challenge the search of Nellie Dixon's apartment. *See supra* at pp. 827–828. To the extent that petitioner's sixth, seventh, and eighth claims again raise the issue of the search and seizure, they are denied. Since plaintiff has no standing to contest the search, trial counsel cannot be found ineffective for failing to move to suppress the specific exhibits mentioned or to call witnesses

---

6. Petitioner has likewise failed to show how he was prejudiced by the testimony. As stated previously, the jurors stated during voir dire that the fact that petitioner was of the Islamic faith would not prevent them from deciding the case on the evidence and the law. *See* document 23 of the record, at p. 4. There is a presumption that the jurors so decided the case, and petitioner has not presented any evidence that would rebut that presumption. Thus, the only possible damage that could have followed from petitioner's association with the Islamic faith would be his connection with the "five percenters," and it is this connection that trial counsel sought to eliminate. Thus, it cannot be said that petitioner was prejudiced by this line of questioning.

7. The specific exhibits to which petitioner refers in his sixth and eighth claims are as follows: Exhibit 14, a black hat found outside the crime scene; Exhibit 16, a green jersey worn during the string of robberies; Exhibit 17, a gun used in the string of robberies; Exhibit 18, gloves worn during the string of robberies; Exhibit 20, a .25 automatic gun; Exhibit 21, an ammunition belt with ammunition; Exhibit 22, a check taken from one of the victims; Exhibit 23, green sneakers worn during the robberies; Exhibit 24, red sneakers; and Exhibit 26, an envelope and letter addressed to petitioner found during the search.

to the search and seizure. To the extent that these claims deal with the admission of evidence involving the string of robberies as opposed to the specific incident at Mueller's Tavern, they will be discussed below in connection with petitioner's twelfth claim of error, which specifically covers this issue. *See infra* at pp. 833–834.

■ Petitioner's ninth claim is that he was denied effective assistance of counsel when trial counsel elicited testimony concerning a conviction for assault and robbery that had occurred over ten years prior to petitioner's trial in the instant case. A review of the transcript, however, reveals that counsel did not elicit the testimony in question; instead, petitioner volunteered the information in the course of a narrative response. The transcript reads as follows:

Q. Mr. Box, you indicated you have been trained as a welder. Where did you receive that training?

A. After I got out of the United States Navy under medical honorable discharge and which I had kidney problems I got in trouble at the age of seventeen. I was arrested for snatching a purse. I was sent to the California youth authority. This is a school where they rehabilitate young men. I was sent there. They sent me to the best school and the best instructors there was and I believe to be in the United States. This is where I got my profession at. This is where I was trained to become a welder and a draftsman there. I was rehabilitated.

*See* document 24 of the record, at p. 478.

Petitioner does not attempt to show how he was prejudiced by this testimony, and the court is unable to find any such prejudice. Petitioner was not cross-examined as to his prior conviction, and the remark was made in the context of explaining how petitioner was able to rehabilitate himself. In any event, any conceivable prejudice was caused by the petitioner himself. Counsel did not elicit the testimony from the petitioner. Petitioner volunteered the information. Counsel cannot be and is not held to a standard that would require him to anticipate prejudicial responses to innocuous questions, as petitioner seems to suggest. *See* document 34 of the record, at p. 10, ¶ I. Thus, the court concludes that counsel did not act unreasonably in posing his question to petitioner, and petitioner has shown no prejudice caused by the testimony to which he refers.

■ Petitioner's next contention is that counsel was ineffective for failing to request a charge on voluntary and involuntary manslaughter. Petitioner contends that he was entitled to such instructions regardless of the evidence presented at trial. Accepting this as true, the court nevertheless finds that petitioner has satisfied neither of the hurdles of *Strickland.*

With regard to the reasonableness of counsel's actions, petitioner's trial counsel testified at a PCHA evidentiary hearing regarding this claim. *See* document 26 of the record. He gave the following reasons for not requesting an instruction on voluntary manslaughter:

Well, I think quite clearly, you either had to accept from the testimony of the Commonwealth witnesses that Earl held the gun which was the murder weapon, or I felt you had to accept the defense strategy that Earl wasn't there. There was no in-between. There was not testimony that would put Earl at the scene of the robbery without being the actual gunman. And since we were going after a not guilty verdict, the availability of a voluntary manslaughter charge as a lesser offense did not strike me as an appropriate trial strategy if—if the charge did not come from the court, I was not in a strategic position to raise it since I felt that it would raise confusion in the minds of the jury, why was that a matter of great concern to me if Mr. Box was not supposed to have been there.

*Id.* at p. 26; *see also id.* at pp. 22–24. Clearly, counsel's decision to eliminate the possibility of confusing the jurors and the possibility of a compromise verdict was not unreasonable. *See e.g., Commonwealth v. Morris,* 492 Pa. 565, 567–570, 424 A.2d 1336, 1338 (1981) ("decision to exclude the

offense of involuntary manslaughter from the jury's consideration was not ... without a reasonable objective basis"); *see also Commonwealth v. Musi*, 486 Pa. 102, 110–111, 404 A.2d 378, 381–382 (1979).

In addition, the court concludes that petitioner has once again failed to establish any resulting prejudice. In the trial court's charge to the jury, the judge instructed the jury on first, second, and third degree murder as well as their attending penalties. "There is not the slightest reason to believe that the jury would have returned a verdict of voluntary manslaughter out of sympathy or in recognition of factors that they may have deemed mitigating where these factors were not sufficiently compelling to cause them to elect the lesser alternative that was offered [*i.e.*, third degree murder]." *Commonwealth v. Jones*, 457 Pa. 563, 574, 319 A.2d 142, 148 (1974), *cert. denied*, 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974).

Petitioner's eleventh claim is that trial counsel failed to object to prejudicial remarks made by the prosecutor during closing argument. Although the closing arguments were not transcribed, petitioner claims the remark was as follows: "I want you to convict the defendant because he said the deceased was one less devil the Black Muslims had to deal with." *See* document 1 of the record, at ¶ 12(K). This court has already concluded the the probative value of this statement was not substantially outweighed by the danger of unfair prejudice. *See supra* at pp. 829–830. In addition, given the testimony of Commonwealth witness Frank Martin, *see* document 24 of the record, at p. 403, the numerous references to petitioner's affiliation with the Islamic religion, and petitioner's own testimony regarding the "five percenters of Islam" who "believed in taking up arms," *id.* at p. 480, the court concludes that the prosecutor's remark falls within the umbrella of fair comment. The words of the court in *Rock v. Zimmerman*, 586 F.Supp. 1076, 1085 (M.D.Pa.1984) are here appropriate: "decisions to make such objections are split-second determinations, lacking the benefit of a written record, and

running the risk of accentuating that which may not have been given much credence to begin with. To declare this ineffective would be an exercise in second-guessing. We decline to do so."

Petitioner's twelfth and thirteenth claims deal with the admission at his trial of evidence regarding the other robberies. Petitioner claims that the trial court erred in admitting such evidence and that his counsel was ineffective for failing to raise this issue on direct appeal. Both claims are without merit.

"It is a well-established principle that evidentiary errors of state courts are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." *Bisaccia v. Attorney General of New Jersey*, 623 F.2d 307, 312 (3d Cir.1980), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980) and cases cited therein. Here, the trial court held that this evidence was properly admitted to establish a common scheme or plan and also to establish the identification of the accused as the perpetrator. *See Commonwealth v. Box*, Nos. 965, 968 C.D.1975 (April 4, 1983). This court is unable to conclude that the evidentiary ruling of the trial court was erroneous much less that it deprived the defendant of fundamental fairness at his trial. *See, e.g., Commonwealth v. Buehl*, 510 Pa. 363, 387, 508 A.2d 1167, 1179 (1986); *Commonwealth v. Styles*, 494 Pa. 524, 431 A.2d 978 (1981); *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977); *see also* Fed.R.Evid. 404(b) (evidence of other crimes admissible to prove plan and identity); *Sharon v. Time, Inc.*, 103 F.R.D. 86, 93 (S.D.N.Y. 1984); *United States v. Burkley*, 591 F.2d 903, 920 (D.C.Cir.1978), *cert. denied*, 440 U.S. 966, 99 S.Ct. 1516, 59 L.Ed.2d 782 (1979). Thus, trial counsel was not ineffective for failing to raise a meritless claim on direct appeal. *Hubbard, supra.*

Petitioner's fourteenth claim is that trial counsel was ineffective for eliciting from Commonwealth witness Frank Martin testimony concerning petitioner pawning guns

for drugs and intravenously injecting the drugs. *See* document 1 of the record, ¶ 12(N). Petitioner claims that this testimony was highly prejudicial and that counsel had no reasonable basis for eliciting this testimony. After carefully reviewing the cross-examination of Frank Martin, the court rejects petitioner's arguments.

■■■ In examining a claim that counsel was ineffective for improperly cross-examining a witness, the question is whether the cross-examination was so deficient or so lacking in tactical purpose as to warrant a finding of ineffective assistance of counsel. *See Commonwealth v. Buehl*, 510 Pa. 363, 382, 508 A.2d 1167, 1176–1177 (1986). While the court agrees that counsel elicited the testimony to which petitioner objects, *see* document 24 of the record, at pp. 408–413, the court cannot conclude that the cross-examination was so lacking in tactical purpose as to constitute ineffective assistance of counsel. By pursuing this line of questioning, counsel was able to develop contradictions in Martin's testimony regarding his own drug use and drug trafficking. *See id.* at pp. 413–417. Counsel also forced the witness to admit that he had previously lied under oath. *See id.* at pp. 417–418. Given that counsel had a tactical purpose in mind in pursuing this line of question, *i.e.*, attacking the credibility of the witness, he cannot be found ineffective for initiating this line of questioning.

■■■ Petitioner's fifteenth and final claim is that counsel was ineffective for not appealing his consecutive sentences for felony murder and two counts of robbery. Petitioner claims that the consecutive sentences violated his rights under the Double Jeopardy Clause of the United States Constitution. Specifically, petitioner alleges the trial court was not authorized to sentence him to a life term for felony murder and to two consecutive terms of ten (10) to twenty (20) years on the counts of robbery that formed the basis of the felony murder conviction. This contention is similarly rejected.

The court acknowledges that the Pennsylvania Supreme Court in *Commonwealth v. Tarver*, 493 Pa. 320, 426 A.2d 569 (1981) held that separate sentences for felony murder and the underlying felony are violative of the Double Jeopardy Clause under the test enunciated in *Blockberger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). In *Commonwealth v. Harper*, 512 Pa. 155, 516 A.2d 319 (1986), however, the court held that *Tarver* would not apply retroactively to cases that became final before *Tarver* was decided on February 4, 1981. Petitioner's case became final on October 5, 1978 when the Pennsylvania Supreme Court denied direct appellate relief. *See Commonwealth v. Box*, 481 Pa. 62, 391 A.2d 1316 (1978).

"The controlling law, at the time *Tarver* was decided, was *Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977). *Sparrow* held that a murder committed in the course of a robbery was a distinct crime from the underlying robbery, and since there was no merger of the crimes, there was nothing improper about sentences for each crime. Thus, no double jeopardy problem was posed, because robbery and murder were separate offenses. *Sparrow* was overruled by *Tarver*, which for the first time applied double jeopardy principles to felony-murder sentencing." *Harper, supra*, 512 Pa. at 159, 516 A.2d at 321.

The Double Jeopardy Clause protects against multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed. 2d 656 (1969). With regard to cumulative sentences, however, the protection is limited; the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing a greater punishment than the legislature intended. *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). In examining what the state legislature intended, this court is bound to accept the Pennsylvania courts' construction of that State's statutes. *Id.* at 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (citing *O'Brien v. Skinner*, 414 U.S. 524, 531, 94 S.Ct. 740, 743, 38 L.Ed.2d 702 (1974)).

As stated previously, at the time petitioner was sentenced, *Sparrow* was the controlling law. The consecutive sentences imposed upon petitioner for felony murder and the two underlying robberies were clearly legal under *Sparrow*. *See Harper, supra,* 512 Pa. at 160, 516 A.2d at 321, 322. Thus, the sentencing court did not prescribe a greater punishment than the legislature intended, and petitioner's sentence is not violative of the Double Jeopardy Clause.

It is true that several cases decided by the United States Supreme Court seem to hold that double jeopardy rulings must be given full retroactivity. *See, e.g., Robinson v. Neil,* 409 U.S. 505, 509, 93 S.Ct. 876, 878, 35 L.Ed.2d 29 (1973), *reh'g denied,* 410 U.S. 959, 93 S.Ct. 1423, 35 L.Ed.2d 694 (1973). The real holding of these and similar cases, however, is that full retroactivity is "a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place." *United States v. Johnson,* 457 U.S. 537, 550, 102 S.Ct. 2579, 2587, 73 L.Ed. 2d 202 (1982) (Fourth Amendment). In the present case, the trial court had the authority to punish petitioner as it did at the time of his sentencing. *See Harper, supra,* 512 Pa. at 160, 516 A.2d at 321, 322. Thus, petitioner has no claim of right to the benefits of the *Tarver* decision.

The foregoing also establishes that counsel was not ineffective for failing to appeal petitioner's sentence. While defense counsel is obligated to inquire thoroughly into all potentially exculpatory defenses and evidence, counsel is not required to anticipate changes in the law or pursue novel theories of defense, *United States v. Baynes,* 687 F.2d 659, 668 n. 11 (3d Cir.1982); *Cerbo v. Fauver,* 616 F.2d 714, 718¢ (3d Cir.1980), *cert. denied,* 449 U.S. 858, 101 S.Ct. 158, 66 L.Ed.2d 73 (1980); *Harper, supra,* 512 Pa. at 160, 516 A.2d at 321, nor must counsel "appeal every possible question of law at the risk of being found to be ineffective." *Cerbo, supra,* 616 F.2d at 718 (quoting *Harshaw v. United States,* 542 F.2d 455, 457 (8th Cir.1976)). Here, counsel argued at the sentencing that any sentence should merge with the felony murder conviction,

with the sentences running concurrently. *See* document 25 of the record, at pp. 2–3. The court rejected this argument, apparently on the basis of the recently issued *Sparrow* decision. *See id.* at 4–5. Counsel decided on an appropriate strategy of concentrating his time on petitioner's strongest issues. *See* document 26 of the record, at pp. 17–18, 25. This was clearly a reasonable strategy. *See Cerbo,* 616 F.2d at 718 ("decisions concerning which legal issues will be argued on appeal are uniquely within the lawyer's skill and competence, and their resolution is ultimately left to his judgment"); *see also Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Williams v. Zimmerman,* No. 86–5731 (E.D.Pa. June 17, 1987); *Commonwealth v. Laboy,* 460 Pa. 466, 471–472, 333 A.2d 868, 870 (1975) ("if, in view of the reasonable alternatives, the appellate advocate had any rational basis for restricting the appeal to the one or two issues chosen, then he has performed as an effective counsel and it matters not that he rejected other issues whether gathered from his own research or advanced by the client.").

After carefully reviewing all of petitioner's claims, this court finds them to be without merit. Petitioner's Petition for Writ of Habeas Corpus will therefore be denied. An appropriate Order will enter.