

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-15-2002

# Fraise v. Barbo

Precedential or Non-Precedential:

Docket 0-5062

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Fraise v. Barbo" (2002). *2002 Decisions*. Paper 183.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/183

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 13, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5062

JAEL FRAISE,

Appellant

v.

JACK TERHUNE, Commissioner

(D.C. No. 98-cv-01917)

ALEXANDER KETTLES,

Appellant

v.

JAMES BARBO; HOWARD BEYER

(D.C. No. 98-cv-01918)

JOHN HARRIS,

Appellant

v.

JAMES BARBO; HOWARD BEYER

(D.C. No. 98-cv-02427)

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(Dist. Court Nos. 98-cv-01917/01918/02427)
District Court Judge: Katherine Hayden

Argued: March 12, 2001

Before: ALITO, RENDELL, Circuit Judges, and
SCHWARZER, District Court Judge1

(Opinion Filed: March 13, 2002)

        GREGORY B. PASQUALE [argued]
        Drinker Biddle & Shanley, LLP
        500 Campus Drive
        Florham Park, NJ 07932-1047

        Counsel for Appellants

        JOHN J. FARMER, JR.
         Attorney General of New Jersey
        PATRICK DeALMEIDA
         Deputy Attorney General
        JEFFREY K. GLADDEN [argued]
         Deputy Attorney General
        R.J. Hughes Justice Complex
        25 Market Street
        P.O. Box 112
        Trenton, NJ 08625

        Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

Jael Fraise, Alexander Kettles, and John Harris filed
actions under 42 U.S.C. S 1983 challenging the
constitutionality as applied to them of a New Jersey prison

_____

1. The Honorable William W Schwarzer, United States District Court for
the Northern District Court of California, sitting by designation.

2

policy that allows correctional officials to designate "security threat groups" ("STGs) and transfer core members of these groups to a special unit. Once in this unit, core members must participate in a behavior modification program before returning to the general prison population. The plaintiffs asserted that these regulations violate numerous constitutional provisions, including the Free Exercise Clause of the First Amendment and the Equal Protection and Due Process Clauses. The District Court granted summary judgment in favor of the defendants, who are New Jersey prison officials. We affirm.

I.

A.

Faced with increasing gang violence in correctional facilities throughout the state, the New Jersey Department of Corrections promulgated a policy in 1998 that was designed to isolate and rehabilitate gang members. Under this policy, prison officials can designate STGs and transfer the "core" members of these groups to the "Security Threat Group Management Unit" ("STGMU"). The goal of this policy is to "limit Security Threat Group activities and, in doing so, minimize the occurrence of assaults on staff and inmates." App. 125.

The specifics of this policy were outlined in a Department of Corrections document entitled "Policy Statement for the Management of Security Threat Group Members" ("STG Policy"). See App. at 125–52. Related regulations were also issued.

The STG Policy defines an STG as:

> A group of inmates, designated by the Commissioner, who may gather together regularly and informally, possessing common characteristics, interests and goals which serve to distinguish the group or group members from other inmate groups or other inmates and which, as a discrete entity, poses a threat to the safety of staff, other inmates, the community, and/or damages to, or destruction of property, and/or interrupting the safe,

3

secure and orderly operation of the correctional facility(ies).

App. 126. STGs are officially designated by the Commissioner based on recommendations from the Intelligence Section of the Central Office Internal Affairs Unit ("Intelligence Section") of the Department of Corrections. See id. at 128.

The STG Policy lists several factors that the Intelligence Section takes into account in considering whether a group should be designated as an STG. See id. These include the following characteristics of the group: (1) its history and purpose; (2) its organizational structure; (3) the propensity for violence of the group and its members; (4) actual or planned acts of violence reasonably attributable to the group; (5) other illegal or prohibited acts reasonably attributable to the group; (6) the "[d]emographics of the group," including its size, location, and pattern of expansion or decline; and (7) the degree of threat that the group poses. See App. 128. Designation of a group as an STG has the effect of prohibiting inmates from engaging in activities related to the group. Under prison regulations, it is a serious infraction for an inmate to "participat[e] in an activity related to a security threat group," N.J.A.C. 10A:4–4.1(.010), or to "possess[ ] or exhibit[ ] anything related to a security threat group." N.J.A.C. 10A:4-4.1(.011). It is also a serious infraction for an inmate to attempt to do either of the above. See N.J.A.C. 10A:4–4.1(.803).

The STG Policy lists criteria to be considered in determining whether a particular inmate should be classified as an STG member. These include: (1) an inmate's acknowledgment of membership; (2) the presence of an STG tattoo; (3) the possession of STG paraphernalia; (4) information from an outside agency; (5) information from an Internal Affairs report or investigation; (6) correspondence from other inmates or outside contacts; (7) STG photographs; and (8) any other factors that suggest that the inmate is involved in STG activities2 or is an STG

---

2. The Policy Statement defines "Security Threat Group Activities" as:

activities or actions of an inmate which relate either directly or indirectly to goals of a Security Threat Group. These activities

4

member. See App. 129. Any inmate who satisfies two of these criteria may be designated as an STG member.

An inmate may be identified as a "core" member of an STG if one or more of the following conditions is satisfied:

> 1. The inmate has a [Department of Corrections] documented status as a recognized Security Threat Group leader;
>
> 2. The inmate has taken a [Department of Corrections] documented part/role in an activity, behavior or involvement in an event/incident associated with a Security Threat Group;
>
> 3. The inmate's [Department of Corrections] documented activities, behavior or involvement in an event/incident whether associated with a Security Threat Group or not, poses a threat to the safety of staff, other inmates, or the community; cause damages to, or destruction of property; cause the interruption of the safe, secure and orderly operation of the correctional facilities;
>
> 4. The inmate has been identified as a Security Threat Group Member and has been found guilty of a prohibited act which is an asterisk offence [sic] in accordance with N.J.A.C. 10A:4 "Inmate Disciple" whether or not this offense was related to a Security Threat Group's activities or not.[3]

_____

> include but are not limited to; Possession of Security Threat Group literature such as lessons, membership lists, manuals and artwork; Possession of Security Threat Group paraphernalia such as, beads, artwork, medallions and clothing articles; Observation by staff of known Security Threat Group hand-signs and/or signals; Participation in Security Threat Group related assaults, disturbances, meetings, gatherings, incidents and events; Sending or receiving Security Threat Group related correspondence; Recruiting of other inmates to join a Security Threat Group.

App. at 126.

3. The term "asterisk offense" designates a grade of inmate infraction. It is defined as "a prohibited act preceded by a number and an asterisk that is considered the most serious and results in the most severe sanction(s)." N.J.A.C. 10A:1-2.2.

5

Id. at 130.

If an inmate is identified as a core member, the inmate is transferred to the STGMU and placed in "Pre-Hearing Security Threat Group Management Unit" status. App. 131. At this point, the inmate is provided with written notice that he or she is being considered for placement in the STGMU and is given at least 48 hours' notice of the hearing before the STGMU Hearing Committee. Id. At the hearing, the inmate may appear in person or may present his or her case through a representative or through written submissions. Id. at 132. The STGMU Hearing Committee may validate the assignment of the inmate to the STGMU if the evidence supports a finding that the inmate is an STG member, has taken an active role in STG activities, and satisfies one of the four previously mentioned conditions. Id. at 133. If the STGMU Hearing Committee assigns the inmate to the STGMU, the inmate may appeal to the administrator of the prison. Id. The administrator's decision may then be challenged in state court.

An inmate assigned to the STGMU remains in maximum custody until the inmate successfully completes a three-phase behavior modification and education program. App. 135. This program "is designed to give the inmate the insight and tools necessary to interact appropriately, without the perceived need of membership in a Security Threat Group." Id. The inmate is taught anger management, conflict resolution, and social interactive skills that feature alternatives to violence. Id . The Committee monitors the inmate's progress and determines whether the inmate should advance to the next phase and eventually return to the general prison population. Id. In order to complete the program and return to the general prison population, an inmate must sign a form renouncing affiliation with all STGs. See App. at 248, 302-04, 443.

B.

The Five Percent Nation originated in New York City in the 1960s after its leader, Clarence Smith (also known as Clarence 13X and Father Allah), broke away from the Nation of Islam. The group's name derives from its belief in

6

"Supreme Mathematics," which breaks down the population of the world into three groups: the Ten Percent, the Eighty-Five Percent, and the Five Percent.

The Ten Percent are those who have subjugated most of the world. They include white people and others who propagate the myth of a nonexistent "mystery God."[4] The Ten Percent are described as follows in a Five Percent Nation text:

> [The 10% are] the rich, slave makers of the poor. Who teach[ ] the poor lies to believe that the Almighty true and living God is a spook and cannot be seen by the physical eye, otherwise known as the blood suckers of the poor.

App. 361.

The Eighty-Five Percent are those who are subjugated and deceived. They "worship what they know not, .. . are easily led in the wrong direction but [are] hard to lead in the right direction." App. 361.

Finally, the Five Percent are African Americans who have achieved self-knowledge. App. 361. They "know the black man's true nature and that God is within man himself." Appellants' Br. at 14. Male members of the group are referred to as "Gods," female members are called "Earths," and the group often refers to itself as "The Nation of Gods and Earths." See App. 458. A declaration of a member explains:

> . . . The Nation of Gods and Earths emphasizes the individual, human freedom and choice.
>
> . . . Our teachings include texts such as the Bible, the Koran, "The 120 Degrees," "Supreme Mathematics," and "Supreme Alphabet".
>
> . . . The Nation of Gods and Earths teaches that. . . our status, as black men, is commensurate with that of the Supreme being.

_____

4. As stated in one of the group's "lessons": "There is no mystery God. The SON OF MAN has searched for that mystery God for trillions of years and was unable to find this so-called mystery God." App. 360.

7

>    . . . We teach man to stop looking for a mystical God
>    to come and solve our problems but to take
>    responsibility to solve our own problems ourselves.
>
>    . . . We teach that worship of Allah is tantamount to
>    worship of oneself and that everyone has "God" within
>    him.

App. 458–59.

Despite the mysterious murder of Clarence 13X in June
of 1969, the Five Percent Nation flourished in certain prison
systems. According to a report prepared by Roland Holvey
of the New Jersey Department of Corrections Internal
Affairs Office ("the Holvey Report"), the Five Percent Nation
became such a strong presence in New York prisons that
Hispanic inmates were prompted to form their own gang,
known as the Latin Kings, to protect themselves from
attacks by Five Percenters. The Five Percent Nation became
active in New Jersey prisons in the early 1980s and has
since become the largest group in the state's prison system.
In addition to New York and New Jersey, the group is also
known to exist in Connecticut, Delaware, Georgia,
Maryland, Massachusetts, North Carolina, Pennsylvania,
South Carolina, Virginia, and the District of Columbia.

The Five Percent Nation claims that it does not promote
or advocate violence, but evidence links the group with
numerous incidents of prison violence. Indeed, according to
the Holvey report, many in the law enforcement community
consider the Five Percent Nation to be "one of the greatest
threats to the social fabric" of the prisons. See App. 336. In
support of this conclusion, the Holvey report cites a string
of incidents that occurred in New Jersey prisons between
August 1990 and July 1997. See App. at 341–43. In August
1990, a Five Percenter was a member of a small group of
inmates who repeatedly stabbed a prison officer and
severely beat other officers. See App. at 341. In May 1993,
an investigation revealed that a Five Percenter sent an
anonymous letter threatening the lives of prison staff at
East Jersey State Prison. See id. In December 1993, more
than 30 inmates at Northern State Prison participated in a
group demonstration in the gymnasium during afternoon
recess. See id. A subsequent investigation revealed that the

group was planning to assault prison staff because prison officials refused to recognize the Five Percent Nation as a religion. See id. Information was also received that the Five Percenters were planning to "take a cop" in the afternoon. See Sealed Appendix at 24. In March 1995, two Five Percenters in the Southern State Correctional Facility were involved in an altercation inside a housing unit. See id. at 342. In May 1996, approximately 50 to 60 inmates belonging to the Five Percent Nation or a rival gang conducted an unauthorized meeting during evening recreation. See id. In August 1996, a melee broke out between Five Percenters and another group in a state prison. See id. Between 25 and 30 inmates were involved in fights. See id. On a day in November 1996, 24 inmates in a youth correctional facility who were affiliated with the Five Percent Nation or rival Hispanic gangs were involved in three separate incidents. See id. In February 1997, a Five Percenter at Riverfront State Prison attacked and seriously injured a correctional officer. See id. at 343. The officer suffered a punctured lung after being stabbed with a homemade knife. See id. After the attack, four other Five Percenters barricaded themselves in the gymnasium, set fires, and damaged prison property. See id. Also in February 1997, a member of the Five Percent Nation was involved in a fight with another inmate. See id. In March 1997, officers at Riverfront State Prison received information that Five Percenters had contracted with members of another gang to assault prison staff members. See id. In July 1997, Five Percenters at Middlesex County Jail participated in a hunger strike. See id. Officers were required to use smoke and concussion grenades to enter two barricaded housing units. See id.

Based largely on the recommendations of Investigator Holvey and others in the Intelligence Section, the Commissioner designated the Five Percent Nation as an STG. The Commissioner also designated two Hispanic gangs, the Latin Kings and the NETAs, and two white gangs, the Prison Bikers Brotherhood and the Aryan Brothers. App. 280. On March 4, 1998, several inmates, including plaintiffs Alexander Kettles and John Harris, were identified as core members of the Five Percent Nation and transferred to the STGMU. See Appellants' Br. at 9. Kettles

acknowledges being a member of the Five Percent Nation, see App. at 36 (Kettles's Affidavit), while Harris denies membership. See App. 61 (Harris's Affidavit). Harris claims to be a Rastafarian who "gain[s] personal and spiritual fulfillment by examining and studying all religions, including The Five Percent Nation." Id. He believes that studying other religions enables him to "better understand and accept others['] points of view." Id. He asserts that he was falsely identified as a Five Percenter simply because he received a letter from a friend who was a member and because some of his Rastafarian literature contained a Five Percent Nation symbol. He refused to sign a statement disavowing association with STGs because he believes that signing would amount to an admission that he belongs to the Five Percent Nation. See id. at 62. The third plaintiff, Jael Fraise, admits membership in the Five Percent Nation. See Appellants' Brief at 9. He was validated as a core member and transferred to the STGMU based on his possession of Five Percenter material. See id.

Kettles, Harris, and Fraise filed separate lawsuits against Department of Corrections officials under 42 U.S.C.S 1983, asserting that their treatment under the STG Policy violated their constitutional rights. They sought injunctive and declaratory relief and damages.

C.

In an unpublished opinion, the District Court granted the defendants' motion for summary judgment. The Court first addressed the plaintiffs' claims that the enforcement of the STG Policy had violated their rights under the Free Exercise Clause. Although the defendants contended that the Five Percent Nation is not a "religion" within the meaning of the First Amendment, the Court did not resolve this issue but rather assumed for the sake of argument that the Five Percent Nation is a "religion." The Court then applied the standard set out by the Supreme Court in Turner v. Safley, 482 U.S. 78 (1987), for assessing prison regulations that restrict inmates' constitutional rights. Under Turner, a regulation passes muster if it is reasonably related to legitimate penological interests. See 482 U.S. at 89. Turner instructs courts to weigh four factors when applying this

10

standard: first, whether the regulation bears a"valid, rational connection" to a legitimate and neutral governmental objective; second, whether prisoners have alternative ways of exercising the circumscribed right; third, whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and fourth, whether alternatives exist that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests." Id. at 91.

With respect to the first factor, the District Court noted that the designation of the Five Percent Nation as an STG was based on concern about security. The Court recognized this as a valid penological concern that is unrelated to the suppression of expression and is consequently neutral for purposes of the Turner analysis. See Dist. Ct. Op. at 14; see also id. After finding "ample evidence that the Five Percent Nation as a group poses a threat to prison security," the Court concluded that the decision to designate the Five Percent Nation as an STG was rationally related to this legitimate and neutral government objective. Id.  at 14–15. The Court also held that the STG Policy's restrictions on the activities of STG members were all rationally related to the goal of prison safety and security. See id.  at 15–19. The Court thus concluded that the first Turner factor weighed in favor of the STG Policy.

In analyzing the second factor –– the availability of alternative ways of exercising the circumscribed right –– the District Court stated that "[t]here must simply be some form of expression available to the inmates . . . and here that requirement is met." Dist. Ct. Op. at 20 (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 352 (1987)). The Court noted that the STG Policy does not impose a total ban on association and expression by STG members and that such inmates continue to have opportunities to participate in religious programs, to fast and pray, to possess certain religious items, and to express their political, social, and cultural views in other ways. See id. at 21.

Turning to the third factor –– the impact that accommodating the asserted constitutional right would have on other inmates, guards, and the allocation of prison

11

resources generally -- the District Court believed that "[a]ccomodating plaintiffs' desire to associate and engage in STG activities . . . undoubtedly would adversely impact the inmate population and prison staff at all correctional facilities by exposing them to a greater risk of assault and disturbance." Id. at 22. The Court thus held that the STG Policy satisfied Turner's third factor.

Finally, the District Court held that the Policy was also supported by the fourth factor -- the absence of alternatives that would fully accommodate the prisoner's rights at de minimis cost to valid penological interests. The Court opined that "[r]equiring an accommodation, like mandating further STG activity on the part of inmates prior to classification, or further demonstration of [a particular inmate's] dangerousness before placement at the STGMU, [would] expose[ ] the general inmate population and the correctional facility staff to an increased risk of violence." Dist Ct. Op. at 23. The Court did not feel that an individualized determination of the threat presented by each inmate identified as an STG member was a viable alternative because, among other things, it would place an undue burden on prison staff. See id. at 24. Accordingly, the Court held that all four of Turner's prongs weighed in favor of the STG Policy, that the Policy was reasonably related to legitimate penological interests, and that it did not violate the plaintiffs' free exercise rights.

The District Court also rejected the plaintiffs' claim that the defendants had violated their equal protection rights by singling out their religion for unfavorable treatment. The Court noted that "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." Dist. Ct. Op. at 24-25 (quoting Jones v. North Carolina Prisoners' Union, 433 U.S. 119, 136 (1977)). Finally, the District Court rejected the plaintiffs' argument that the Department of Corrections violated due process by failing to give adequate notice before promulgating and acting pursuant to the STG Policy. The Court held that the plaintiffs had not shown that placement in the STGMU deprived them of a protected liberty interest. The plaintiffs then took this appeal.

12

II

We first address the plaintiffs' claim that the STG Policy violates their First Amendment right to the free exercise of their religion. All parties urge us to resolve this issue by applying the standards set out in Turner, and we take that approach.5

In Turner, the Supreme Court began by noting that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." 482 U.S. at 84. The Court recognized, however, that inmates' constitutional rights must in some respects be limited in

_____

5. It is not clear that Turner factors should be considered before determining whether a contested prison regulation would violate the constitutional right that the inmate invokes if the regulation were applied to persons not in prison. After all, incarceration almost always results in a narrowing, not a broadening, of constitutional protections.

Turner discussed five prior Supreme Court cases involving inmate constitutional claims, and in all of those cases the challenged prison regulation would have been plainly unconstitutional outside the prison context. See Procunier v. Martinez, 416 U.S. 396 (1974)(restrictions on the contents of incoming and outgoing prisoner mail); Pell v. Procunier, 417 U.S. 817 (1974)(restrictions on face-to-face media interviews with individual inmates); Jones v. North Carolina Prisoners' Union, Inc., 433 U.S. 119 (1977)(regulations prohibiting meetings, solicitations, and bulk mailings related to prison union); Bell v. Wolfish, 441 U.S. 520 (1979)(restrictions on inmates' receipt of hardcover books not mailed directly from publishers, book clubs, or book stores); Block v. Rutherford, 468 U.S. 576 (1984)(ban on contact visits). The same is true of Turner itself, which concerned restrictions on the right of inmates to correspond with other prisoners and to marry, as well as O'Lone v. Shabazz, supra, which involved restrictions on attendance at religious services.

The defendants have not argued, however, that we should first determine whether the regulations at issue here would violate the Free Exercise Clause if applied outside the prison context. See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993); Employment Div. Dept. of Human Res. of Oregon v. Smith, 494 U.S. 872 (1990). We therefore do not reach this issue.

We also note that the plaintiffs have not raised any argument under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. S 2000cc-1, which may address some of the concerns expressed by the dissent, and we therefore do not discuss that statute.

13

order to accommodate the demands of prison administration and to serve valid penological objectives. See id. The Court also emphasized that the judiciary is "ill equipped to deal with the increasingly urgent problems of prison administration and reform" and should therefore give significant deference to judgments made by prison officials in establishing, interpreting, and applying prison regulations. See id. at 84–85. Accordingly, the Court held, prison regulations that curtail an inmate's constitutional rights need only be reasonably related to legitimate penological objectives. See Turner, 482 U.S. at 89. See also, e.g., Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999); Abu-Jamal v. Price, 154 F.3d 128, 132 (3d Cir. 1998); Cooper v. Tard, 855 F.2d 125, 128 (3d Cir. 1988). As noted, under the Turner framework, four factors must be considered in assessing the reasonableness of such regulations. Id. at 90–91. We will discuss each of these factors separately.

A.

We agree with the District Court that the STG Policy is supported by Turner's first prong. A prison regulation fails this prong if it "promotes an interest that is illegitimate or not neutral, or . . . bears no `valid, rational connection' to the asserted interest." Waterman, 183 F.3d at 214 (quoting Turner, 482 U.S. at 89–90). Here, contrary to the suggestion of the dissent that the New Jersey scheme "targets members of one religion," Dissent at 27, the STG Policy is entirely neutral and does not in any way take religion into account. It is also beyond dispute that New Jersey has a legitimate penological interest in maintaining order and security within the prison system. See O'Lone , 482 U.S. at 350-51; Turner, 482 U.S. at 91–92. Recognizing this, the plaintiffs challenge the STG Policy by arguing that the Holvey Report does not provide a sufficient basis for concluding that prison violence can be attributed to the Five Percent Nation. See Appellants' Br. at 21-22. The plaintiffs maintain that there has been "no showing . . . that a greater proportion of Five Percenters are more violent than a group of Christians, Muslims, Jews or atheists" and that the Holvey Report found only that some Five

14

Percenters are violent. Id. at 24. Contending that the decision to classify the Five Percenters as an STG was based on a report full of "unfounded speculations," the plaintiffs argue that the STG Policy and the restrictions imposed on them are not rationally related to the legitimate objective of maintaining prison order and security. We disagree.

As discussed above, the Holvey Report recounts numerous instances of actual or planned violence involving Five Percenters in New Jersey correctional facilities from August 1990 through July 1997. See App. 341–43. Although the plaintiffs and the dissent contend that these incidents are insufficient to justify STG treatment, Turner instructs judges to exercise great caution before second-guessing the expert judgment of correctional officials on a question of this nature. See Turner, 482 U.S. at 84–85; DeHart v. Horn, 227 F.3d 47, 52 (3d Cir. 2000). The Turner Court wrote:

> "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " [Martinez v. Procunier, 416 U.S. 396, 405 (1974).] As the Martinez Court acknowledged, "the problems of prisons in America are complex and intractable. . . . Id., at 404–405. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in Martinez, additional reason to accord deference to the appropriate prison authorities. See id., at 405.

To these observations, we would add that a measure of deference is especially appropriate when a regulation implicates prison security.

Viewing the summary judgment record in the manner dictated by Turner, we are satisfied that the defendants had

15

adequate grounds for concluding that inmates belonging to the Five Percent Nation present a serious security threat.

We note that other courts have reached the same conclusion. The Fourth Circuit has observed, the Five Percent Nation has a "history of violence" in the South Carolina prison system. See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters , 174 F.3d 464, 466–69 (4th Cir. 1999) (hereinafter " Five Percenters")(describing violent incidents involving members of the group and referring to a federal intelligence summary that called the Five Percenters a "radical Islamic sect/criminal group" that "is often boldly racist in its views, prolific in its criminal activities, and operates behind a facade of cultural and religious rhetoric"). The United States District Court for the Western District of New York reached a similar conclusion concerning the New York system. See Self–Allah v. Annucci, No. 97–CV–607(H), 1999 WL 299310, at *9 (W.D.N.Y. Mar. 25, 1999)(referring to the "substantial history of violence associated with Five Percenter activities" and finding that the Department of Corrections "reasonably concluded that Five Percenters represent a STG within the [New York] prison system"). That court wrote:

> [T]he Five Percenters act as an organized group within the prison system to receive new members, intimidate members of rival groups, and participate in criminal activity, including extortion, robbery, assaults and drug trafficking. Seemingly innocuous literature is used to send messages in code form. Five Percenter literature also assists in keeping the gang organized, in allowing members of the group to be identified, and in legitimizing the group and its violent activities.

Id. Several other courts –– including a state court in New Jersey –– have also referred to the close connection between the Five Percent Nation and violence or gang–related activity. See Allah v. Beyer, 1994 WL 549614, at *3 (D.N.J. Mar. 29, 1994); Box v. Petsock, 697 F. Supp. 821, 831 (M.D. Pa. 1987); Allah v. Department of Corr. , 742 A.2d 162, 165 (N.J. Super. Ct. App. Div. 1999); Buford v. Goord, 686 N.Y.S.2d 121, 122 (N.Y. App. Div. 1999) (referring to the Five Percent Nation as "an unauthorized organization that

16

engages in gang-related activity both inside and outside of the facility"). We agree with these courts and therefore hold that there is a rational connection between New Jersey's STG regulations and the legitimate and neutral objective of maintaining order and security within the prison system.[6]

The dissent disagrees with our evaluation of the first Turner factor primarily because the dissent is unwilling to accord any significant deference to the judgment of the responsible New Jersey officials that the Five Percent Nation presents a security threat within the state's correctional system. The dissent disparages the Holvey report because Holvey's "credentials consist largely of on-the-job training." Dissent at 32. The dissent characterizes the incidents of actual or planned violence recounted in the report as merely "anecdotal" evidence and then diminishes the significance of particular incidents on a variety of grounds. Dissent at 32-33 n.9. For example, the dissent describes as merely a "gathering" an incident in which members of the Five Percent Nation congregated in a gym to protest their treatment by the authorities, and correctional officials received information that the Five Percenters were planning to "take a cop." Id. Incidents in which Five Percenters attacked and seriously wounded correctional staff are dismissed as simply "involving a single FPN member." Id. What the dissent seems to demand is

---

6. In fact, there is evidence in the record that the STG policy has been effective in reducing violence in prisons. As Investigator Holvey testified
during his deposition: "I can also say that since the opening of the Security Threat Group Management Unit on March 4th of 1998, there have been no serious incidents, gang-related incidents, within the whole Department of Corrections. There's no question that it's a direct result of
the initiative of the Security Threat Group Management Unit." App. at 259. According to Holvey, prior to the STG Policy,"[e]very day there would be some kind of gang-related incidents related to one of these five gangs [that had been designated as Security Threat Groups]." Id. Howard Beyer, the Assistant Commissioner of the New Jersey Department of Corrections, also submitted an affidavit indicating that the program has been successful. See App. at 84 ("The use of close custody units has proven successful in the maintenance of discipline, security, safety, and an orderly operation of correctional facilities in the New Jersey Department of Corrections and will continue to assist the administrators and management in the inmate population.").

17

either (a) proof that the tenets of the Five Percent Nation require members to engage in violence[7] or (b) hard statistical proof that members of the Five Percent Nation commit proportionally more acts of violence in New Jersey prisons than do members of other religions.[8] Demanding proof of this stature before correctional officials can act to prevent gang violence is fundamentally inconsistent with Turner and would in all likelihood be paralyzing.

B.

1. We now consider the District Court's analysis of the second Turner factor. As noted, this factor requires a court to assess whether inmates retain alternative means of exercising the circumscribed right. See Turner , 482 U.S. at 90; DeHart, 227 F.3d at 51. When assessing the availability of alternatives, the right in question must be viewed "sensibly and expansively." DeHart, 227 F.3d at 53 (quoting Thornburgh v. Abbott, 490 U.S. 401, 417 (1989)). Therefore, in a free exercise case, we must consider whether the inmate has "alternative means of practicing his or her religion generally, not whether [the] inmate has alternative means of engaging in [any] particular practice." Id. at 55. We will first discuss the restrictions that the New Jersey Policy imposed on the plaintiffs simply because they were designated as members of the Five Percent Nation; we will then consider the additional restriction imposed as a result of their validation as core members.

2. Ordinary members. In applying the second Turner factor in a free exercise case, we must of course focus on the beliefs of the inmate asserting the claim. It is obviously impossible to determine whether a regulation leaves an inmate with alternative ways of practicing the inmate's religion without identifying the religion's practices. The plaintiffs bore the burden of producing evidence of their beliefs and practices. In order to do this, they submitted

---

7. See Dissent at 31 (demanding proof that "membership in the Five Percent Nation carried with it a set of beliefs that each member acts upon to promote violence and disorder" or proof that "membership equates to an active commitment to violence").

8. See Dissent at 32-33.

18

the declaration of G. Kalim, a member of the Five Percent Nation and the editor of a newspaper called The Five Percenter. See App. 457-60. Mr. Kalim's declaration explains the basic beliefs and practices of the Five Percent Nation, and we have therefore closely examined Mr. Kalim's declaration to determine the degree to which the challenged STG Policy restricts the plaintiffs' religious practices.

Mr. Kalim's declaration describes the Five Percent Nation (or The Nation of Gods and Earths, as he calls it) as a loosely structured group -- in his words, "a group of people who share a common way of life." App. 459. His declaration does not state that members of the group are required, expected, or counseled to participate in or attend any rites or gatherings or to perform any acts of religious observance. Indeed, his declaration states that"[t]o become a member . . . , all one need do is study the lessons and aspire to live a righteous life." Id. at 459. His declaration makes it clear that the group rejects belief in the transcendent and instead focuses on human enlightenment and conduct as ends in themselves. According to Mr. Kalim, the Five Percent Nation "teach[es] man to stop looking for a mystical God" and "emphasizes the individual, human freedom and choice." Id. at 458. He states that the group teaches people to attain "knowledge and enlightenment," to have "respect for society," and to eschew violence and disavow "white hatred." Id . He adds that the group attempts "to train young individuals to better themselves in the community" and that the group's "principal purpose is to teach our young self worth, responsibility, and self love." Id. The group appears to believe that these goals can be achieved by understanding the group's view of world history, see id., but it seems clear that an understanding of this is viewed as a means to enlightenment and right behavior, not an end.

Based on Mr. Kalim's declaration, it appears that one central practice of the Five Percent Nation is restricted by the STG Policy provisions applicable to ordinary members, namely, the ability to "study the lessons." App. 459. As noted, the Policy prohibits inmates from "participating in any activity(ies) related to a security threat group" or possessing the group's literature. See N.J.A.C. 10A:4-

19

4.1(.010), (.011). However, even the study of the Five Percent Nation's teachings is not completely prohibited. Mr. Kalim's declaration states that the group's "teachings include texts such as the Bible [and] the Koran."9 App. 458. While the STG Policy forbids possession of distinctively Five Percent Nation literature, it is undisputed that the Policy allows inmates to possess, study, and discuss the Bible and the Koran. Accordingly, study of the Five Percent Nation's teachings is only partially restricted.

The STG Policy appears to leave ample room for all of the remaining activities mentioned in Mr. Kalim's declaration. Certainly nothing in the STG Policy restricts Five Percent Nation members from discussing or seeking to achieve self-knowledge, self-respect, responsible conduct, or righteous living. To be sure, the STG Policy restricts the ability of Five Percenters to achieve these things by following what the group may regard as the best avenue, i.e., by studying and discussing doctrines and materials distinctive to the Five Percent Nation. But alternative avenues clearly remain open.

In sum, our examination of the second Turner factor in relation to the plaintiffs' explanation of their beliefs leads us to the conclusion that, while the New Jersey STG policy undoubtedly imposes restrictions on the ability of rank-and-file Five Percenters to engage in activities related to the group, the Policy does not foreclose all alternative avenues of practice.

3. Core members. Application of the second Turner factor to "core" members presents an additional difficulty because the Policy requires core members assigned to the STGMU to renounce "affiliation" with their STG as a condition of returning to the general inmate population. See App. at 248, 302-04, 443. If the STG Policy demanded that core members of the Five Percent Nation renounce the beliefs of the group, we could not say that the second Turner factor is satisfied. We do not, however, interpret the STG Policy as demanding a renunciation of beliefs. (The Policy does not, for example, require a core member to deny

_____

9. As the plaintiffs put it in their brief, members of the group "study the writings from the various recognized religions." Appellants' Br. at 14.

20

the truth of the "Supreme Mathematics.") What it requires instead is a promise not to associate with certain other prisoners while in prison.

The form that a core member must sign requires the core member to renounce "affiliation with all Security Threat Groups," App. 443, and a security threat group is defined by the Policy as "[a] group of inmates . . . who may gather together regularly and informally . . . ." Id . at 126. Thus, what is required is a renunciation of affiliation with a particular group of inmates (those who belong to an STG), not a renunciation of beliefs. In simpler terms, the Policy requires the end of any form of gang membership or participation. In view of this interpretation of the STG Policy, we conclude that even core members of the Five Percent Nation retain alternative avenues of practicing their religion, namely, those previously discussed in connection with ordinary members.

C.

We agree with the District Court's analysis of Turner's third prong. "When accommodation of an asserted right will have a significant `ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Turner, 482 U.S. at 90. The record, as noted, contains evidence that Five Percenters pose a security threat to prison officials and other inmates. Dist. Ct. Op. at 22. As the Fourth Circuit has stated:

> Prison administration often involves tough tradeoffs. In the closed environment of a prison, greater liberties for some may mean increased danger and intimidation for others. Because increased freedom for the Five Percenters would come "only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike," we are particularly reluctant to interfere with the judgment of the [prison officials] in this case.

Five Percenters, 174 F.3d at 470 (quoting Turner, 482 U.S. at 92-93). Particularly in light of the highly deferential

21

standard of review that applies here, we agree with the Fourth Circuit and conclude that this factor is satisfied.

D.

We also agree that Turner's fourth factor weighs in favor of the Policy. Turner does not impose a least-restrictive-alternative test. See Waterman, 183 F.3d at 219. Rather, our inquiry is whether there are alternatives that would impose only "de minimis cost to valid penological interests." Turner, 482 U.S. at 91.

In this case, the District Court considered alternatives to the New Jersey system, such as toughening the showing needed for STG designation, but concluded that these would expose "the general inmate population and the correctional facility staff to an increased risk of violence." Dist. Ct. Op. at 23. The plaintiffs argue that the District Court misunderstood their argument. See Appellants' Br. at 32. They contend that the Department of Corrections should not have designated "an entire belief system," i.e., the Five Percent Nation, as an STG but instead should have designated only "specific hierarchical `gangs' with members who are Five Percenters." We disagree. We reiterate that our inquiry is not whether the state could have adopted a less restrictive alternative but rather whether it could have adopted an alternative that imposed only "de minimis cost to legitimate penological interests." Turner , 482 U.S. at 91. As we have explained, the state had adequate grounds for concluding that the Five Percent Nation presented a threat to prison order and security. The alternatives to which the plaintiffs point would have done less to mitigate this threat and thus would have had a more than de minimis impact on the state's legitimate penological concerns. Therefore, we agree with the District Court that the final Turner factor supports the Policy.

E.

We have concluded that three of the four Turner factors weigh strongly in favor of the STG Policy. These factors are the existence of a "valid, rational connection" to a legitimate and neutral governmental objective, the effect that

22

accommodating the plaintffs would have on other inmates, guards, and the allocation of prison resources generally, and the availability of alternative regulatory approaches that would "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests." The remaining factor –– the availability of alternative means of exercising the circumscribed right –– presents a closer question, but we hold that it too is met. Accordingly, we affirm the decision of the District Court that the challenged STG Policy does not violate the plaintiffs' free exercise rights. Accord In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464 (4th Cir. 1999)(upholding similar South Carolina policy).

III.

We now consider the plaintiffs' argument that the defendants violated their equal protection rights by treating them less favorably than members of other religious groups. See Appellants' Br. at 40. In making this argument, the plaintiffs point to the Sunni Muslims, and claim that this group, although similar to the Five Percent Nation, has been treated less harshly. According to the plaintiffs, the Sunni Muslims have several of the characteristics of an STG, such as a common history and purpose, an organizational structure, recognized leaders, customary salutations, and a considerable size. They also note that Holvey admitted during his deposition that some Sunni Muslims had shown "a propensity for violence . . . [o]n occasion" and that some illegal or prohibited acts "could be associated with Sunni Muslims." See Appellants' Br. at 35–36. They also rely on Holvey's statement that the"big" difference between the Sunni Muslims and the Five Percent Nation is that the Sunnis practice a religion and the Five Percenters do not. See id. at 37.

In DeHart, our court, sitting en banc, held that when an inmate asserts an equal protection claim based on the allegedly disparate treatment of different religious groups, the governing standard is whether the disparate treatment is " `reasonably related to legitimate penological interests.' " 227 F.3d at 61 (citation omitted). That standard is met here. While relying on one portion of Holvey's deposition,

the plaintiffs do not mention another part of the deposition in which Holvey stated that the Sunni Muslims have a much lower propensity for violence than the Five Percenters. See App. 214. Moreover, while Holvey cited religion as a major difference between the two groups, Holvey did not state that religion played any role in the decision whether to designate either group as an STG. We note that the STG Policy makes no reference to religion, and we are not aware of any other evidence in the record that suggests that religion plays any role in STG designation decisions. In view of greater propensity for violence demonstrated by members of the Five Percent Nation, we hold that the group's designation as an STG does not violate equal protection.

IV.

The plaintiffs' final argument is that the Department of Corrections violated their due process rights by failing to provide any notice of the new regulations until the day of the plaintiffs' transfer to the STGMU. The plaintiffs contend that this deprived them of any opportunity to modify their behavior to comply with the new regulations. See  Reply Brief at 16–17. The District Court rejected this argument, concluding that the plaintiffs were not deprived of a protected liberty interest. See Dist. Ct. Op. at 26–28. We agree.

To succeed on their due process claim, the plaintiffs must first demonstrate that they were deprived of a liberty interest when they were transferred to the STGMU. "Protected liberty . . . interests generally arise either from the Due Process Clause or from state-created statutory entitlement." Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000); see also Asquith v. Dep't of Corrections , 186 F.3d 407, 409 (3d Cir. 1999). The Supreme Court has recognized that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." Asquith, 186 F.3d at 410 (quoting Hewitt v. Helms, 459 U.S. 460, 468 (1983)). Here, the plaintiffs

24

were not subjected to confinement that exceeded the sentences imposed upon them or that otherwise violated the Constitution, and therefore no liberty interest created by the Due Process Clause itself was impinged. See Hewitt, 459 U.S. at 468 ("It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence.").

The defendants are also unable to demonstrate that they were deprived of a state-created liberty interest. In Sandin v. Conner, 515 U.S. 472, 484 (1995), the Supreme Court set out the standard for determining whether a prisoner has been deprived of a state-created liberty interest. These interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id.; see also Shoats, 213 F.3d at 143; Asquith, 186 F.3d at 412. In ascertaining whether something is an "atypical and significant" hardship, we must consider "what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." Asquith, 186 F.3d at 412 (quoting Griffin v. Vaughn, 112 F.3d 703, 706 & n.2 (3d Cir. 1997). Consequently, the focus of this inquiry should not be on the language of a particular regulation, but rather on the nature of the deprivation. See Sandin, 515 U.S. at 481-82. Although inmates who are transferred to the STGMU face additional restrictions, we hold that the transfer to the STGMU does not impose an atypical and significant hardship in relation to the ordinary incidents of prison life. See Griffin, 112 F.3d at 706-08 (15 months in administrative segregation not atypical and significant hardship); see also, e.g., Jones v. Baker, 155 F.3d 810, 813 (6th Cir. 1998)(confinement in administrative segregation for two and one-half years is not "atypical and significant" hardship); Pichardo v. Kinker , 73 F.3d 612, 613 (5th Cir. 1996)(rejecting as frivolous a claim that classification as gang member and placement in administrative segregation unit deprived inmate of a protected liberty interest). Thus, the plaintiffs lack a

25

protected liberty interest and their due process claim must fail. In addition, even if the plaintiffs had been deprived of a protected liberty interest, the procedures used in determining whether an inmate is a core STG member satisfy procedural due process. See Shoats, 213 F.3d at 144-47. As noted, an inmate who is identified as a core STG member receives notice and a hearing at which the inmate may be heard. The inmate may appeal an adverse decision to the administrator of the prison and may obtain judicial review in state court. These procedures satisfy due process. Id. As for the plaintiffs' complaint that they were identified as core members based on conduct that occurred before the STG Policy was promulgated, we held in Shoats that due process is not violated by placing an inmate in administrative custody based on past conduct that furnishes a basis for predicting that the inmate will engage in future acts of violence if corrective measures are not taken. Id. at 146-47.

V.

For the reasons explained above, we affirm the decision of the District Court.

26

RENDELL, Circuit Judge, dissenting:

I disagree with the reasoning of, and result reached by, both the District Court and the majority. I think we are faced here with an issue of much greater import, both practically and analytically, than mere permissible prison regulation. While some measure of deference is certainly to be afforded to prison authorities, nonetheless we must make certain that we do not convert the Turner v. Safley test into a rubber stamp. Here, the policy at issue has been applied so as to target a religious group for different treatment, including a blanket denial of First Amendment rights.1 We must deal with this wholesale treatment of members of a religious group in a careful manner.

Appellants urge us to address the following question: When the prison adopts a policy and then targets members of one religion and imposes significant burdens on-- even perhaps totally impedes -- their religious exercise, based solely on the prisoners' religious affiliation, does not the first prong of the Turner v. Safley test require that the violence of the group and the members subjected to this treatment be clearly proven in order for such group treatment to be "reasonably related" to the legitimate goal?2

_____

1. While providing a detailed description of the procedures provided by the STG policy, the majority does not reference the extensive restrictions imposed on Appellants. According to the STG policy, restrictions on inmates in Phase 1 of the program include: strip-searches each time they leave or return to their cells; a total of five hours per week out of their cells; a shower or shave only every third day; only a single, non-contact visit each month; only one monitored phone call per week; prohibition on correspondence with any other inmate, including incarcerated family members; all meals eaten in cells; and, no access to regular prison programs. App. at A138-42, 148. Further, the Policy instructs that "[t]here is a `Zero Tolerance' level for Security Threat Group activity within the Department's correctional facility(ies)." App. at A152. Examples of such activities include: "Possession of Security Threat Group literature such as lessons, membership lists, and artwork; Possession of Security Threat Group paraphernalia such as beads, artwork, medallions, and clothing articles; . . . Participation in Security Threat Group related . . . meetings, gatherings, . .. and events . . . ." App. at A152.

2. One could quibble with whether the restrictions are on all members, because the close custody only applies to those determined to be "core

27

Two key facts are present here that, I submit, warrant that we proceed with extra caution. First, the policy is being applied based on membership in a group, specifically, in a religious group; the individual conduct that results in the purported basis for the imposition of the restriction is not violent or threatening activity, but, rather, is religious observance essentially protected by the First Amendment. Second, the cognitive "leap" from the fact of membership in a religion to the validity of a concern about security is not an automatic one, not "common sense," and we must require a showing of the proper fit between membership in the religious group and valid security concerns.

The confluence of these two factors should cause us to pause and consider the appropriate test, and the applicable evidentiary burden. We have noted that the first prong of Turner is subject to the test of a "means-end fit," which we have described as follows:

> We may conclude that the statute bears no "valid, rational connection" to rehabilitation if "the logical connection between the [statute] and the asserted goal is so remote as to render the policy arbitrary or irrational."

Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999) (citing Turner v. Safley, 482 U.S. 78, 89-90 (1987). We went on to explain: "This standard is similar to rational-basis review, under which a statutory classification can be declared unconstitutional only where the relationship of the classification to its asserted goal is `so attenuated as to

_____

members." However, given that mere possession of materials about FPN (the sole basis for Fraise's designation) raises an individual to "core member" status and the fact that these individuals will only be released from close custody upon repudiation of the religion, together with the weak case against Appellants, points to the conclusion that all FPN believers who either read or express in any fashion the teachings of the Five Percent Nation, are clearly at risk and subject to restrictive custody.
Interestingly, it has been noted that Five Percenters read and learn, rather than pray, as their religious observance, and this goes to the essence of what is being denied here. See Self-Allah v. Annucci, No. 97-CV-607(H), 1999 WL 299310, * 2 (W.D.N.Y. 1999) ("Five Percenters are obligated to study and learn the lessons of the Five Percent Nation of Islam.").

28

render the distinction arbitrary or irrational.' The legislature's judgment therefore need not be perfect, just rational." Id. (citations omitted).

But what about the situation where the prison regulation targets a specific religious group -- where it does not merely burden the exercise of religion, but, rather, effectively singles out members of a certain religious group for different treatment and denial of free exercise rights?[3] I suggest that in such a situation we should require an even "closer fit" between the religious group's classification and the state's proffered security interests.

This unique aspect of this case has not been fully explored by the parties, but it is nonetheless troubling. Does it make any difference that the group targeted is a religion and that "core" membership is the determining factor for imposition of restrictions? Is this not more insidious than a ban on certain conduct or specific activity that happens to have an impact on one's religious beliefs or exercise? Laws targeting religious beliefs are clearly suspect;[4] and, the right to religious freedom is not to be surrendered at the prison door. See O'Lone v. Shabazz, 482 U.S. 342, 348 (1987).

When applying the Turner test in a case placing harsh restrictions upon inmates with certain religious beliefs, I proffer that we should indeed require a "tight" or "closer" fit between the correctional system's admittedly legitimate

_____

3. In order to be released from the STGMU, inmates must sign a "Letter of Intention" expressing their intention "to renounce formally and in spirit affiliation with all Security Threat Groups." App. at A443.

4. See Church of Lukumi Babalu Aye Inc. v. Hialeah, 508 U.S. 520, 533 (1993) ("[A] law targeting religious beliefs as such is never permissible . . . ."); McDaniel v. Paty, 435 U.S. 618, 626 (1978) ("The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such."); Torcaso v. Watkins, 367 U.S. 488, 495 (1961) ("We repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person `to profess a belief or disbelief in any religion."); Cantwell v. Connecticut, 310 U.S. 296, 304 (1940) ("In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom.").

interest and an inmate's beliefs. The Supreme Court has not indicated that the Turner test must be a rigid one and has in fact referenced with approval the concept that it would be reasonable to require a closer "fit" in certain instances, for example, where the threat to the government interest is not as great.[5] I suggest that a closer fit might be required when the inmate's interest -- his religious beliefs -- is so significant and the restrictions are so great.

In Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999), we found a rational relationship where the authorities denied prisoners the right to read pornographic materials. Testimony was presented by two different psychologists to the effect that pornographic material would thwart the effectiveness of the treatment being given to the prisoners -- who were all sex offenders who had exhibited "repetitive and compulsive" behavior. The prison authorities also referred the court to a considerable body of research supporting this view. We upheld the regulation and noted that, there, we probably would not have needed the expert opinions because " `common sense tells us that prisoners are more likely to develop the now-missing self-control and respect for others if prevented from poring over pictures that are themselves degrading and disrespectful.' " Waterman, 183 F.3d at 217 (quoting Amatel v. Reno, 156 F.3d 192, 199 (D.C. Cir. 1998)).

_____

5. In Abbott, the Supreme Court noted that where "the nature of the asserted governmental interest is such as to require a lesser degree of case-by-case discretion, a closer fit between the regulation and the purpose it serves may safely be required." Thornburgh v. Abbott, 490 U.S. 401, 411-12 (1989) (discussing and overruling Procunier v. Martinez, 416 U.S. 396 (1974)). The Supreme Court explained that the rejection of the regulation in Martinez was based on the Court's "recognition that the regulated activity centrally at issue in that case-- outgoing personal correspondence from prisoners -- did not, by its very nature, pose a serious threat to prison order and security." Id. at 411. The Court clarified: "We do not believe that Martinez should, or need, be read as subjecting the decisions of prison officials to a strict `least restrictive
means' test." Abbott, 490 U.S. at 411. The Court overruled Martinez as far as it suggested a legal distinction between incoming correspondence from prisoners and incoming correspondence from nonprisoners. Id. at 413-14.

30

However, this reasoning does not apply here. There, we approved of a ban on certain literature based on specific objective criteria demonstrably consistent with legitimate penological objectives; here, we are faced with a round-up of all members of a purportedly violent religion so that they can be subjected to religious "detox" in the name of security. I submit that if prison authorities are to be permitted to target and categorize a certain religion so as to severely circumscribe First Amendment rights, based solely on membership in the religion, we should require that the first prong of the Turner v. Safley test be satisfied only by, at a minimum, a close fit between the targeted religion and problem sought to be avoided, here, to "minimize the occurrence of assaults on staff and inmates," and evidentiary requirements that leave no room for doubt. To require any less is to permit -- perhaps encourage-- profiling: that is, the arbitrary attribution of certain characteristics to a group and, therefore, members of that group, resulting in denial of rights and different, disadvantaged treatment.

Further, it would be one thing if the prisons were only "profiling" security threat groups that are clearly violent "gangs;" but, here, the District Court assumed that the Five Percent Nation was a religion.6 The evidence before the District Court was woefully lacking that membership in the Five Percent Nation carried with it a set of beliefs that each member acts upon to promote violence and disorder. 7 The

_____

6. This case would present different issues had the District Court not assumed that the Five Percent Nation was a religion. The Court would have been required to determine whether FPN would be considered a religion, and therefore accorded the protections provided by the Free Exercise Clause of the First Amendment. As this issue is not before us, and was not before the District Court, we need not decide whether the FPN would satisfy these requirements, but only stress that non-traditional belief systems found to be religious in nature will be afforded
the same protections as traditional ones. See Africa v. Pennsylvania, 662 F.2d 1025, 1031-32 (3d Cir. 1981) (setting forth three indicia to be used in determining whether a "religion" is at issue).

7. While the FPN tenets may be racial in tone, racism is not the same as violence. See McCabe v. Arave, 827 F.2d 634, 638 (9th Cir. 1987) ("[P]rison authorities have no legitimate penological interest in excluding

31

District Court relied on a report prepared by Ronald Holvey, an eighteen-year veteran employee of the New Jersey correctional system. His credentials consist largely of on-the-job training,8 and his report includes no proof of what, I suggest, is required -- namely, that membership equates to an active commitment to violence. Instead, the report is anecdotal, recounting, as the Appellees even note in their brief, "twelve violent or threateningly violent incidents involving a member or members of the Five Percent Nation" during a seven year period. Appellees' Brief, p. 14. There is no proof of violent gang activity involving FPN members in New Jersey prisons, and none of the incidents links the conduct to the members' religious beliefs.9 Mr. Holvey cites

_____

religious books from the prison library merely because they contain racist views. Courts have repeatedly held that prisons may not ban all religious literature that reflects racism."); Stefanow v. McFadden, 103 F.3d 1466, 1472-73 (9th Cir. 1996) (applying Turner and observing that "[m]erely `advocating racial purity' is insufficient to justify confiscati[ng]"
religious material, and upholding the confiscation of the book Christianities Ancient Enemy because it directly advocates violence by issuing an explicit "call to arms for white Christians to fight back in `a war for survival' "); Murphy v. Missouri Dep't of Corrs., 814 F.2d 1252, 1257 (8th Cir. 1987) (holding that restriction of inmate access to racist religious materials "must be limited to those materials that advocate violence or that are so racially inflammatory as to be reasonably likely to
cause violence at the prison"); Aikens v. Jenkins, 534 F.2d 751, 756-57 (7th Cir. 1976) (striking down a regulation banning all racist periodicals in prison because the regulation "is not narrow enough to reach only that material which encourages violence, and invites prison officials to apply their own personal prejudices and opinions as standards").

8. Holvey has eighteen years of experience in corrections employment, including service as a corrections officer. Appellees note that he belongs to several national or regional law enforcement or intelligence organizations, including the National Major Gang Task Force, and that he has assisted several states and organizations, including the Federal Bureau of Investigation, with the process of identifying security threat groups and members as well as training. Holvey Deposition, App. at A249-50, 254-58.

9. The majority characterizes the Holvey Report as reporting a "string of incidents" and as citing "numerous instances of actual or planned violence involving Five Percenters in New Jersey correctional facilities

absolutely no statistics with respect to crimes by Five Percent Nation members, as compared to crimes by other groups. In fact, in pointing out that one in seven prison inmates is a member of the Five Percent Nation, the paucity of violent incidents purported to be linked to FPN members actually casts doubt on the violent nature of the group. No showing was made that there was a greater proportion of violence by FPN members than by groups of other kinds, such as Christians, Jews, or Muslims. The evidence is probative only of the assertion that there are several members of the FPN that have committed violent or unruly acts.

Nowhere in their brief do Appellees counter, let alone point to evidence that would meet, Appellants' statement that the Five Percent Nation's "teaching does not in any way advocate or encourage violence or disorderliness."10
_____

between August 1990 and July 1997." Maj. at 15. In reality, a careful scrutiny of the report and corresponding attachments reveals very little evidence of planned or actual violence by FPN members, let alone by the Five Percent Nation as a group. In his report, Holvey lists twelve "Specific
Violent Acts/Intended Acts of Violence/Specific Illegal or Prohibited Acts." App. at A342–43. Of this twelve, three do not even involve the New Jersey correctional facilities, App. at A402–03, 404–11, and two more relate to New Jersey youth facilities –– one involving a gathering of approximately 50 FPN and NETA members, and the other consisting of a fight including some believed to be FPN members. App. at SA41–46. Of the remaining seven incidents there were two gatherings, App. at SA24–29, A412, and three incidents involving a single FPN member. App. at SA5–20, SA48–56. There was only one report of a series of altercations allegedly involving more than one FPN member along with several Sunni Muslims. App. at SA37–39. And one letter allegedly from an FPN member threatening violence against prison guards. SA21. None of these incidents reflects activity atypical of aggressive behavior one would anticipate in a prison setting. The incidents cited in the report do not demonstrate the FPN's violent tendencies as a group or gang in the New Jersey prison system. The report conflates incidents from other places, as well as violence by other inmates where a FPN member may have been tangentially involved, with incidents involving the FPN as a group.

10. Moreover, it should be noted that Appellees in their brief really fail to
address the underlying "disconnect" that I perceive, but urge instead that the threat group policy is related to a legitimate goal. Appellants concede this, but argue that the designation of the Five Percent Nation is not so related because there is no valid connection in the New Jersey prison system between the Five Percent Nation and security concerns.

33

App. Br. at 22. Rather, the District Court and the majority allude to the findings of other courts to the effect that the Five Percent Nation fosters violence. Those courts based their rulings on evidence before them, involving the facts presented to them. The District Court here should demand no less, but only the Holvey report was presented and relied upon. There is no basis for the District Court to take judicial notice of the evidence before other courts.

Further, most of the decisions referenced by the District Court and the majority, in addition to being non-precedential, are either distinguishable or not relevant.11 In the most persuasive and well-reasoned opinion cited, Self-Allah v. Annucci, No. 97-CV-607(H), 1999 WL 299310, *2 (W.D.N.Y. 1999), the issue is quite different -- whether the court would enjoin the prison authorities' confiscation of the prisoners' copies of The Five Percenter. The injunction was denied, based upon extensive testimony and evidence presented with respect to the violent propensity of the Five Percenters in the New York system. Many witnesses testified (including Mr. Holvey) in favor of the relationship between the gang violence in the system and the group. The Court concluded:

> Plaintiff has demonstrated that Five Percenterism, in
> its pure, uncorrupted form, represents a system of
> beliefs which, outside the prison context, does not
> advocate or promote violence. However, the testimony
> presented by defendants showed a clear relationship

---

11. See Allah v. Beyer, 1994 WL 549614, at *1-3 (D.N.J. Mar. 29, 1994) (upholding the transfer of FPN member where there was specific evidence that the inmate took a leadership role in planning a violent uprising in the prison); Box v. Petsock, 697 F. Supp. 821, 831 (M.D. Pa. 1987) (considering petitioner's religious affiliation in the context of an ineffective assistance of counsel claim); Abed v. Comm'r of Corrs., 682 A.2d 558 (Conn. App. Ct. 1996) (holding that petitioner, not an FPN member, did not have a liberty interest in good-time credit); Allah v. Dep't of Corrs., 742 A.2d 162, 165 (N.J. Super. Ct. App. Div. 1999) ("We accept the argument of the DOC that it neither `targeted' a religion nor classified religious beliefs as a security threat group, but merely designated an association of inmates based on its history of violence as a security threat group."); Buford v. Goord , 686 N.Y.S.2d 121, 122 (N.Y. App. Div. 1999) (upholding a ban on FPN literature).

34

between Five Percenter literature and prison gang activities.

Id. at *9. The majority is misguided to suggest that this supports their conclusion "that inmates belonging to the Five Percent Nation present a serious security threat." Maj. at 16 (emphasis added). There is a very important difference between a threat posed by "belonging" to a religion and that allegedly posed by the circulation of the group's literature.

In the only other court of appeals case involving a similar threat group policy, In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464 (4th Cir. 1999) [hereinafter Five Percenters], the Court of Appeals for the Fourth Circuit noted its jurisprudence as requiring "some minimally rational relationship," id. at 468, and emphasized the Supreme Court's jurisprudence calling for deference, especially when dealing with state correctional institutions and the preservation of order therein. Id. at 469 (citing Turner, 482 U.S. at 85, and Bell v. Wolfish, 441 U.S. 520, 547 (1979)). The court noted "ample evidence in the records" supporting the reasonableness of the conclusion that they posed a threat to prison security, including incidents in 1992, 1993, and three specific incidents in 1995, and referenced at least one incident report in which it was stated that " `these five inmates acted as a group,' that they `felt as if they were acting in a manner acceptable to the[ir] religious beliefs,' and that they `spoke of more violence to come.' " Id. at 466. The prisoners in that case were not denied their religious literature (this claim had been settled), and the court gave great deference to the prison system's decision as "manifestly a rational action." Id. at 470. The court went on to explain:

> The question is not whether [the South Carolina Department of Corrections ("SCDC") director's] conclusion was indisputably correct, but whether his conclusion was rational and therefore entitled to deference. Confronted with multiple reports of an identifiable group whose members not only threatened but had actually committed serious, violent acts in the SCDC system and elsewhere, [SCDC Director's]

35

decision to designate the Five Percenters as an STG was manifestly a rational action.

Id. at 470 (citation omitted). It explained:"Allowing prison officials to act only after a demonstration of individual dangerousness would deprive them of the all-important option of prevention. The threat of violence here was a group threat, and prison administrators were entitled to address it in those terms." Id. at 466.

While I think the test of "minimally" rational relationship has not been employed by our court and chips away at Turner, I cannot argue with the result reached in that case.12 The group had been identified based on clear, repeated past group violent conduct, attributable to its set of beliefs. But we have no such evidentiary record here. Accordingly, not only is the purported relationship more tenuous but the genuineness of the security threat is more remote as well. Additionally, the restrictions there did not include denial of literature, which is at the heart of the FPN's exercise. In the case before us, the implications are much more far-reaching and the evidence much less relevant and convincing. There has been no showing of the "means-end fit" to satisfy the wholesale denial of religious freedom and exercise.

If the inquiry does not satisfy the first prong of Turner, which we have explained received the greatest weight, the prison's action must fail. See Shaw v. Murphy , 532 U.S. 223, 121 S. Ct. 1475, 1479 (2001) ("If the connection between the regulation and the asserted goal is`arbitrary or irrational,' then the regulation fails, irrespective of whether the other factors tilt in its favor."). Therefore, we need not reach the other prongs. However, I cannot help but note my disagreement with the ease with which the majority dispenses with the second and third prong as well. The answer to the "alternate means" prong is really self-evident -- the prison authorities' course of "treatment" is designed to cause the FPN adherent to give up his faith, not permit

_____

12. In Shaw v. Murphy, Justice Thomas referred to rebutting the presumption of rationality. However, that language was dicta and I suggest did not lower the standard of Turner , nor did it require the burden of proof to fall on the plaintiff.

him to practice it. This is much different than the facts before the Fourth Circuit in Five Percenters, where the court found that because the prisoners could still pray, fast and study religious materials, the "alternate means" test was satisfied, and the proven violence satisfied the"no ready alternatives" prong. In the course of this treatment, the FPN member is barred from the teachings, which are at the heart of the Five Percent Nation religious experience. Furthermore, to be released from close custody he must promise to never again affiliate with FPN. Thus, the desired result of the treatment is to eradicate the belief. It is difficult to see how, realistically, there are "alternate means" here.

In connection with the "impact of the accommodation on others" prong, here, the premise that potential violence cannot be accommodated assumes the very violence that I suggest has not been shown. I would suggest that the absence of a showing of the violent connection as discussed above undermines the findings of the District Court and the majority with respect to this prong as well.

We have in this country a rich tradition of protecting individual rights, including the rights of prisoners. We have explained that "the Supreme Court has made clear that `convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison' " DeHart v. Horn, 227 F.3d 47, 50 (3d Cir. 2000) (en banc) (quoting Bell v. Wolfish, 441 U.S. 520, 545 (1979)). Furthermore, " `Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." Id. (quoting O'Lone v. Shabazz, 482 U.S. 342, 348 (1987)). At the same time, we have a fast-developing body of law to the effect that, while inmates do not shed their constitutional protections at the jailhouse door, nonetheless "a prison inmate `retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system,' " id. at 51 (quoting Pell v. Procunier, 417 U.S. 817, 822 (1974)), and "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." Shaw v. Murphy, 532 U.S. 223, 229 (2001).

37

We have, at times, overreacted in response to perceived characteristics of groups thought to be dangerous to our security or way of life and condemned individuals based on group membership. See, e.g., Garner v. Bd. of Pub. Works, 341 U.S. 716 (1951) (upholding requirement that all city employees must disclose membership to the Communist party and swear an oath of loyalty); Korematsu v. United States, 323 U.S. 214 (1944) (affirming the constitutionality of "excluding" people of Japanese descent from the West Coast during World War II). Only later, when we have viewed these reactions with some perspective, have we acknowledged that the wholesale treatment of certain groups was not consistent with the basic tenets of our democracy. Here, similarly, it seems as though there is a rush to brand the Five Percent Nation as a "violent" religious sect. But, who is next? Would it be the Sunni Muslims, whose tenets, Appellants argue, are similar? Would it be the Nation of Islam, viewed by some as racist? While these may be inmates, and prisoners, they are nonetheless people. We should therefore be concerned, and be careful in labeling and judging them based solely on membership in a religious group.

If membership in such groups can objectively be shown, upon close scrutiny, to be equated to posing a real threat of violence in the prison setting, then treatment of such group members in wholesale fashion, even though it deprives them of their constitutional rights, would be consistent with legitimate penological objectives, and would be permissible. Otherwise, such discriminatory treatment treads impermissibly on their constitutional rights.

I would reverse the District Court's ruling and deny defendant's motion for summary judgment for lack of a showing that the first prong of the Turner v. Safley test has been satisfied.13

_____

13. I see no need to address Appellants' equal protection or due process claims. I agree with the majority that we apply the same Turner analysis to Appellants' equal protection claim that we did to their First Amendment claims, and my concerns with the majority's Turner analysis carries over to the equal protection analysis as well. On the other hand, I will not provide my own reasoning regarding Appellants' due process claim, as I agree with that provided by the majority.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit